In re FIRST CHICAGO CORPORATION
SECURITIES LITIGATION.

KUNZE, et al., Plaintiffs,

v.

FIRST CHICAGO CORPORATION, First
National Bank of Chicago, Barry F.
Sullivan, Richard L. Thomas, and William J. McDonough, Defendants.

No. 90 C 1899.

United States District Court,
N.D. Illinois, E.D.

May 1, 1991.

Robert M. Kornreich, Wolf, Popper, Ross, Wolf & Jones, New York City, Richard S. Schiffrin, Michael David Craig, Schiffrin & Craig, Chicago, Ill., for plaintiffs.

Lynn Adrian Goldstein, John Charles Simons, First Nat. Bank of Chicago, Charles William Douglas, Walter C. Carlson, David Robert Stewert, Sidley & Austin, Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, Chief Judge.

Economic developments of the last several years have taken their toll on many segments of society. On March 29, 1990, The First Chicago Corporation ("First Chicago") announced that it too was suffering from economic woes: net income was down 45 percent, provisions for loan losses had been increased, and nonperforming loans were up. Contrasting this performance with earlier reports of conservative loaning practices, diversified portfolios, adequate loan loss reserves, and a rigorous new credit management process, plaintiffs, a class comprising all persons who, between January 13, 1989, and March 29, 1990, acquired First Chicago common stock either through purchase on the open market or in exchange for Ravenswood common stock, charge First Chicago and six of its officers and directors with misrepresenting the

health of the corporation. Now before this court is defendants' motion to dismiss the complaint. For the following reasons, that motion is granted.

## I. Section 10(b) and Rule 10b–5 Allegations

### A. The Complaint

■ In their fifty-page complaint, plaintiffs quote extensively from various press releases, letters to shareholders, annual reports, 10–Q and 10–K forms, results and dividend announcements, and miscellaneous statements in an attempt to document the allegedly fraudulent statements of the defendants. In paragraphs 18 through 72, plaintiffs target quotations that highlight the achievements and tout the strength of the company in general and in certain areas of operation in particular. Without detailing each quoted statement, we offer a synopsis of these allegations:

(i) *General statements of First Chicago's strong performance.* Defendants are quoted as boasting of the high level of performance in the record year 1988 (¶ 21), the excellent performance in the first quarter of 1989 (¶ 38), and the record results in the second quarter of 1989 (¶ 45). Defendants also point to the continuation of 1988's momentum in 1989 (¶ 43), downplay minor setbacks in the third quarter of 1989 by stressing the strength of the balance sheet (¶ 54), note a 4 percent increase in operating earnings in the fourth quarter of 1989 (¶ 58), and attribute the corporation's success to the broad diversity of its earnings sources (¶ 38).

(ii) *Dividend Increases.* The complaint asserts that defendants announced dividend increases during the first quarter of 1989 (¶ 20) and the fourth quarter of 1989 (¶¶ 58, 60, 64).

(iii) *Strength of Credit Management Process.* The complaint contains numerous statements by defendants boasting of their strong credit management process (¶¶ 22, 64), which was restructured in 1984 (*see* ¶¶ 22, 33). The review process was described as strict and disciplined (¶¶ 27, 32, 65) and a high priority for First Chicago (¶¶ 28, 65). Loan portfolios and credit risks, defendants continued, were monitored closely and reviewed continually, and attention was given to the continuing change and volatility of the marketplace (¶¶ 50, 57, 65); estimates of potential losses were made quarterly for the purpose of assessing the adequacy of the allowance for credit losses (¶¶ 50, 57). The restructured credit process, which promoted diversification of risk (¶¶ 32, 65) was credited with contributing to the corporation's healthy performance in 1988 (¶¶ 28, 32). First Chicago's "strong credit management" was listed as one of the corporation's greatest strengths and a distinct and valuable competitive advantage (¶¶ 42, 64) and, defendants claimed, was "designed to result in above-average industry performance" (¶ 64).

(iv) *High Quality of Loan Portfolios: General.* Defendants repeatedly touted the quality of their credit, especially in the commercial loan portfolio (¶¶ 19, 22, 38, 41, 45, 61, 64) and stated that excellent credit quality was a priority (¶ 28). The improved quality of its loan portfolio, defendants claimed, was reflected in the low level of net charge-offs (¶¶ 32, 50) and in the decreased allowance for credit losses in 1988 (¶¶ 19, 28, 31, 32) and in the first quarter of 1989 (¶¶ 38, 40, 41); the allowance level, defendants explained, represents management's judgment of the level necessary to provide for probable credit losses (¶¶ 28, 34). The low credit loss provision in 1988, defendants observed, suggested a moderate level of newly identified probable losses (¶ 32). The level of nonperforming assets were reported to be decreasing (¶¶ 19, 28, 32, 38, 41). Defendants attributed the improvement in the credit quality in 1988 to the disciplined credit process and the strengthening Midwest economy (¶ 32).

(v) *High Quality of Loan Portfolios: Highly Leveraged Transactions.* Defendants, the complaint asserts, cautioned that the highly leveraged transaction ("HLT") portfolio required special attention but that their rigorous management

(defendants stressed that this portfolio was governed by a special group of senior professionals and upper management following strict policies and limits) (¶¶ 25, 29, 51) and conservative practices (¶ 29) with respect to the portfolio made them confident that these loans did "not present excessive risks to our stockholders" (¶ 25). The HLT portfolio was represented as well-diversified (¶ 51), and defendants observed that no charge-offs had been taken and no HLT loans placed on the non-performing asset list in 1988 (¶ 29) or in the second quarter of 1989 (¶ 51).

(vi) *High Quality of Loan Portfolios: Real Estate Lending.* Defendants conceded that real estate lending, like the HLT portfolio, required special attention but exposure and risk were minimized by defendant's disciplined lending practices (¶ 25). Identifying commercial real estate lending as "an important portfolio segment for them," defendants indicated that the portfolio had experienced only modest growth recently in contrast to the increasing exposure industry-wide (¶¶ 30, 64), a conscious management strategy in light of industry conditions (¶ 64). Real estate portfolios were described as diversified by project type and geography (¶¶ 30, 64), and the experience and expertise of the management team were touted (¶ 30). Defendants also represented that First Chicago's real estate customers were "upper-tier and experienced" (¶ 64).

(vii) *High Quality of Loan Portfolios: Troubled Country Debt.* The recognized "credit problems" of the troubled-country debt ("TCD") portfolio, defendants advised, were dealt with aggressively (¶ 23) with conservative but assertive management (¶¶ 23, 27, 45), which actively sought to decrease the level of exposure in this area (¶¶ 24, 43). Defendants boasted that the troubled-country debtor reserve was effective and one of the strongest in the industry (¶¶ 38, 39, 43, 60).

(viii) *Optimism about the Future: Three Objectives.* Defendants on several occasions adverted to three goals to be

achieved by 1991: (1) a return on target equity of 16 or greater; (2) a common equity ration of at least 5.5 percent of assets; and (3) a reduction in the TCD portfolio to at least $1.5 billion while retaining a strong reserve level (¶¶ 26, 64). Following the report of second quarter 1989 results, defendants credited the corporation with making "continued progress toward these financial goals" (¶ 45) and expressed their determination to "sustain this momentum ... and achieve even further gains" (¶ 46). Defendants pointed to stock dividend increases announced by the Board of Directors as evidence of their confidence that the three objectives would be met (¶¶ 27, 64, 60). Defendants also revealed their optimism about the corporation's potential for future success in more general terms (¶¶ 27, 64).

After cataloguing these statements of confidence and optimism, the complaint proceeds to allege that on March 29, 1990,

First Chicago announced that serious problems in its real estate loan portfolio had caused the provision for loan losses for the first quarter of 1990 to triple ... to approximately $150 million to $160 million, and that net income for the first quarter of 1990 would be approximately 50% of the net income reported in the first quarter of 1989.... First Chicago also estimated that its nonperforming assets would rise about 15 percent from the 1989 year-end level of $1.1 billion.

(Complaint ¶ 67). Following this announcement, the complaint continues, First Chicago released its actual operating results for the first quarter of 1990. These results, which included increases in the credit loss provision, total net charge-offs, commercial nonperforming loans, and real estate asset exposure, and a decrease in net income, "indicated the[ ] true deteriorated condition [of the loan portfolios] and the poor quality of internal controls, which had previously been hidden by the defendants" (Complaint ¶ 71).

In paragraph 73 of the complaint, plaintiffs charge the defendants with knowingly and recklessly making materially false and

misleading statements regarding First Chicago's rigorous credit review and management policies and its "exceptional loan quality and diversification"; at the time these statements were made, plaintiffs allege, "First Chicago was in the process of initiating high risk, non-diversified loans, such as to VMS Realty Partners, its internal controls were inadequate to assess credit risk and to monitor problem loans, and its commercial and TCD loan portfolios were not of high quality and were under-reserved" (*id.*). Defendants' statements in paragraphs 18 through 72 were fraudulent, plaintiffs elaborate in paragraph 74, because they were materially false and misleading and omitted to state certain material facts that would make them not misleading:

(a) *Credit Quality*. Defendants failed to disclose that commercial loans were not diversified but were concentrated in risky commercial real estate loans such as loans in excess of $200 million to VMS Realty Partners (¶ 74(a)); misrepresented that shareholders were not subject to excessive risks in loan portfolios (¶¶ 74(e), 74(h)); failed to disclose that First Chicago had initiated a substantial real estate loan in excess of $200 million to the VMS Realty Partners without adequate collateral, guarantees, or assurances that it could be syndicated (¶ 74(g)); misrepresented that First Chicago had achieved a high caliber of operating performance and that credit quality, especially commercial, overall is exceptional (¶ 74(h)); misrepresented that the real estate portfolio was geographically diversified and characterized by upper-tier and experienced customers (¶ 74(*l*)).

(b) *Predictions and Objectives*. Defendants misrepresented that they were confident that First Chicago would achieve and was making progress toward achieving its financial objectives (¶ 74(b))

(c) *Credit Control and Review*. Defendants misrepresented the effectiveness and quality of its loan procedures and failed to disclose that the credit review, initiation, and control programs were not functioning adequately and were being disregarded by senior officers (¶ 74(c)); misrepresented that provisions for credit losses were conservative when in fact they were inadequate for the risk presented and reflected lack of credit controls (¶ 74(c)); misrepresented that the strength of First Chicago's loan portfolios stemmed principally from disciplined credit process (¶ 74(f)); misrepresented that credit management process was designed to produce excellent loan portfolio quality and that the newly established process was performing well (¶ 74(i)); misrepresented that the credit process was disciplined and was and would continue to be an advantage over competitors (¶ 74(j)); misrepresented that it had a policy of adhering to judicious lending limits and expeditiously disposing of problem assets (¶ 74(k)).

These allegations give rise to a violation of section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) (1988), and Rule 10b–5, 17 C.F.R. § 240.-10b–5 (1990), plaintiffs assert, because the defendants, "[w]ith knowledge or reckless disregard of the true financial and operating condition of First Chicago, ... caused the reports, statements and releases to contain misstatements and omissions of material fact" (Complaint ¶ 77).

**B. Dismissal on Rule 12(b)(6) Grounds**

Plaintiffs' allegations of misrepresentations and omissions with respect to the riskiness and diversification of First Chicago's loan portfolios and the inadequacy of its credit management and review process, defendants submit, are merely claims that First Chicago mismanaged its business affairs and are therefore not cognizable under *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). In *Santa Fe*, minority shareholders of Kirby Lumber Company sought to set aside the merger of Kirby Lumber with its parent corporation, which owned 95% of the Kirby Lumber stock. The merger constituted a 10b–5 violation, the minority shareholders argued, because it was effected without notice and for the sole purpose of eliminating the minority from the com-

pany rather than for a legitimate corporate purpose. Rejecting the minority's position, the Supreme Court held that the language and legislative history of section 10(b) offered "no indication that Congress meant to prohibit any conduct not involving manipulation or deception," 430 U.S. at 473, 97 S.Ct. at 1301, and because the minority shareholders were alleging only a breach of fiduciary duty without "deception, misrepresentation, or nondisclosure," 430 U.S. at 476, 97 S.Ct. at 1302, the parent's conduct violated neither section 10(b) nor rule 10b–5. Since *Santa Fe*, courts have stressed the distinction between claims that arise from acts of corporation mismanagement and claims that contain an element of manipulation or deception and have refused to permit plaintiffs to "bootstrap" allegations of fraud by asserting that a defendant failed to disclose corporate mismanagement or a breach of fiduciary duty. *See Panter v. Marshall Field & Co.*, 646 F.2d 271, 288 (7th Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). Although mismanagement may in some circumstances contribute to—or even account for—poor performance and depressed earnings, "[s]ecurities laws do not guarantee sound business practices and do not protect investors against reverses." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990) (citing *Santa Fe*).

Allegations that a defendant failed to maintain adequate loan loss reserves or invested in unduly risky or speculative loans, without more, seem to claim merely that the corporation was mismanaged. But the inclusion of an allegation of inadequate loan loss reserves, for example, in a plaintiff's complaint does not automatically foreclose the possibility that the complaint may properly plead a 10b–5 violation. *See Gollomp v. MNC Financial, Inc.*, 756 F.Supp. 228, 230–31 (D.Md.1991). A representation that loan loss reserves were maintained at an adequate level may be incorrect.[1] And it may be deceptive if the defendants knew that it was not accurate when made. *See DiLeo*, 901 F.2d at 627 (failure to increase loan loss reserves may amount to fraud if the inadequacy of the reserves is "so apparent"); *Gollomp*, 756 F.Supp. at 231 (inadequate loan loss reserves not mismanagement where " 'defendants' failure to increase the … reserves did not merely constitute the exercise of poor banking judgment but was so lacking in factual basis that it necessarily resulted either from a deliberate intent to defraud or a reckless disregard for the truth' ");[2] *In re Midlantic Corp. Shareholder Litig.*, 758 F.Supp. 226, 228 (D.N.J.1990). The same analysis obtains for allegations that defendants extended risky loans while representing that credit quality was excellent and failed to manage loan portfolios adequately while boasting of rigorous management procedures.

Although heightened pleading requirements may present further obstacles to these allegations, those requirements are addressed in a separate analysis under Rule 9(b) of the Federal Rules of Civil Procedure and do not affect the sufficiency of allegations for purposes of Rule 12(b)(6). Plaintiffs have alleged that defendants "knowingly and recklessly" made the "materially false and misleading statements" regarding First Chicago's credit review pol-

---

1. Plaintiffs in this case allege repeatedly that defendants represented their loan loss reserves as accurate (Complaint ¶¶ 50, 57 (estimates of potential losses are made quarterly for the purpose of assessing the adequacy of the allowance for credit losses); ¶¶ 28, 34 (low credit loss provision reflected management's view of potential losses)). Even without these statements, however, claims of inadequate loan loss reserves may be actionable under Rule 10b–5 because the mere disclosure of reserve levels implies that the reserves are adequate. Failure to provide adequate loan loss reserves, moreover, would result in an overstatement of earnings,

which would be an alternative source of misrepresentation. *See Gollomp*, 756 F.Supp. at 230.

2. Although the Supreme Court has not yet decided whether reckless conduct satisfies the scienter requirement for section 10(b) and rule 10b–5 violations, *see Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–94 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976), the Seventh Circuit has held that recklessness is sufficient. *See Goldberg v. Household Bank, F.S.B.*, 890 F.2d 965, 967 (7th Cir.1989); *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1238 (7th Cir.1988).

icies and practices, loan quality, and adequacy of loan loss reserves (Complaint ¶¶ 73, 74(a), 74(c), 74(d), 74(e), 74(f), 74(g), 74(h), 74(i), 74(j), 74(k), 74(*l*), 77), and those allegations easily pass 12(b)(6) muster. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

■■■ Defendants also urge this court to dismiss on 12(b)(6) grounds the allegation that "[d]efendants misrepresented that they were 'confident' that First Chicago would achieve, and was making progress toward achieving, its operating objectives for fiscal 1989, and succeeding years, including a return on equity of 16 percent or greater for 1989 through 1991" (Complaint ¶ 74(b)). When considered in the context of the entire document in which it appeared, this expression of optimism, the defendants assert, is somewhat tempered and reduced to a vague opinion that is nothing more than "puffing" and therefore nonactionable. We disagree.

In conjunction with their motion to dismiss, defendants offer as exhibits reproductions of most of the press releases, quarterly and annual reports, and miscellaneous documents from which the plaintiffs have quoted selectively in their complaint. Defendants ask this court, in considering the adequacy of plaintiffs allegations, to evaluate the quotations in the complaint with regard to their context. As a general matter, we are restricted, in deciding a motion to dismiss under Rule 12(b)(6), to the allegations contained in the complaint; to the extent the court accepts and considers matters outside the pleading, the motion is to be treated as one for summary judgment under Rule 56. *See* Fed.R.Civ.P. 12(b). Exhibits attached to a pleading, however, will be considered part of the

pleading for all purposes pursuant to Rule 10(c), *see* 5 C. Wright & A. Miller, *Federal Practice & Procedure* § 1327, at 761 (2d ed. 1990), and pertinent documents that a plaintiff fails to append to his complaint but that a defendant attaches to his motion to dismiss will be treated similarly. *See id.* at 762–63; *Field v. Trump*, 850 F.2d 938, 949 (2d Cir.1988), *cert. denied*, 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989); *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1015 (1st Cir.), *cert. denied*, 488 U.S. 821, 109 S.Ct. 65, 102 L.Ed.2d 42 (1988). To the extent that the written document contradicts the allegations in the complaint, the former controls. *See* 5 C. Wright & A. Miller, *supra*, § 1327, at 766–67; *LeRoy v. Illinois Racing Board*, No. 89 C 3433, 1990 WL 7072 at 2 (N.D.Ill. Jan. 18, 1990). We think it proper to consider defendant's submissions, which relate to the core of plaintiffs' claims of securities fraud, in deciding this motion to dismiss.[3] *See Field*, 850 F.2d at 949 ("In determining whether these claims [of securities fraud] were properly dismissed [on materiality grounds] under Rule 12(b)(6), we may of course refer to the Offer to Purchase and the 1984 Proxy Statement, which were annexed to defendants' motion to dismiss and are documents that are integral to plaintiff's claims.").

■■ Plaintiff's charge of deceptive optimism is based in part on a statement in First Chicago's Letter to Shareholders in its 1988 Annual Report expressing confidence regarding the corporations ability to perform successfully in the future:

> We are optimistic about the potential for future success for the Corporation. This feeling was supported by our Board of Directors with its declaration on January

**3.** In the memorandum submitted in support of their motion to dismiss, defendants assert rather categorically that the documents omitted from plaintiffs' complaint "do not support their allegations" (Defendants' Memorandum at 4). Providing several examples of the disparity between the statements quoted in the complaint and the statements as they appear in their proper context, defendants opine that "[i]t is not necessary to point out every instance as to which plaintiffs' 'substantive allegations' distort or misrepresent what, in fact, First Chicago

said" (*id.*). In considering defendants' exhibits, however, this court is not required to sort, unguided, through the lengthy reports and releases and compare the statements in the complaint with those in the exhibits; to the extent the defendants believe that the complaint mischaracterizes what they represented in these exhibits, it is their duty to apprise us specifically of the basis for this position. Accordingly, we will consider only the explicitly referenced instances of alleged distortion.

13 of this year of a 20 percent increase in the dividend rate on common stock. This increase reflects both the exceptional performance in 1988 and the Board's confidence in our ability to achieve our financial goals in 1989 and beyond.

(Complaint ¶ 27). Defendants observe that the Letter to Shareholders concludes, "We hope you share in this optimistic outlook for your Corporation" (Defendant's Ex. C at 5), and elsewhere in the Annual Report, defendants continue, the optimism is qualified by the admission that, although the corporation's strong showing in 1988 "stemmed principally from the disciplined credit process," a "healthy economy assisted in bringing about these strong results" (*id.* at 9). And while stressing the importance of maintaining excellent credit quality at First Chicago, the Annual Report cautioned that "such an outstanding performance may not be sustainable every year" (*id.*). Defendants conclude that the Annual Report could not reasonably be interpreted as guaranteeing or ensuring that subsequent performance would be as strong as 1988's (Defendant's Memorandum at 5, 24).

The allegations of fraudulent optimism are not limited to representations in the 1988 Annual Report, however; plaintiffs also quote the defendants as stating, on the announcement of the 1989 fourth quarter results, that "despite a tough year for banking ... the board of directors demonstrated its confidence in First Chicago's future by increasing the quarterly stock divided to 50 cents per share from 45 cents" (Complaint ¶ 60). The Letter to Shareholders contained in the 1989 Annual Report contained a similar declaration of optimism: "The Board of Directors recently increased the common stock dividend by 11 percent, reflecting their confidence that we will achieve these financial goals" (Complaint ¶ 64).

Individually, and especially taken together, these allegations properly state a claim for securities fraud. Although some courts have suggested that section 10(b) and rule 10b–5 liability cannot be grounded on vague expressions of optimism or opinion that constitute mere "puffery," *see Alfus v. Pyramid Technology Corp.*, 745 F.Supp. 1511, 1519 (N.D.Cal.1990); *Campo v. Shearson Hayden Stone, Inc.*, [1980 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,517 at 97,726, 1980 WL 1409 (S.D.N.Y.1980), the distinction between fact and opinion or puffery has been rejected by other courts and commentators, *see* L. Loss, *Fundamentals of Securities Regulation* 717 (2d ed. 1988), and questioned in this district. *See Flournoy v. Peyson*, 701 F.Supp. 1370, 1376 (N.D.Ill.1988). Because a defendant can only be liable under section 10(b) or rule 10b–5 for a making a *material* misrepresentation or omission, *see Beck v. Cantor, Fitzgerald & Co.*, 621 F.Supp. 1547, 1553 n. 5 (N.D.Ill.1985); *Loan*, 717 F.Supp. at 966, and because materiality is measured by the likelihood that "a reasonable investor would find the omitted or misstated fact significant in deciding whether to buy or sell a security, and on what terms to buy or sell," *Rowe*, 850 F.2d at 1233, we agree with those who find the concept of mere opinion or "puffery" not useful in the securities fraud context; to the extent a statement is too vague or obvious puffery, no investor would pay that statement much attention, and it would be found nonactionable on a materiality theory. Indeed, in *Naye v. Boyd*, [1986–87 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,979 at 94,809, 1986 WL 198 (W.D.Wash.1986), the court, considering an allegation that the defendant fraudulently predicted continued success, granted the defendant summary judgment on the grounds that the statements were "so vague and devoid of concrete information that the court [wa]s *hard pressed to believe any reasonable investor would rely on* such obvious puffing to make an investment decision." (Emphasis added).

Materiality has been characterized as a mixed question of law and fact, and courts have admonished that "[o]nly when the disclosures or omissions are so clearly unimportant that reasonable minds could not differ should the ultimate issue of materiality be decided as a matter of law." *See Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 641 (3d Cir.1989) (citations omit-

ted). The expressions of optimism and confidence in this case might be dismissed by seasoned investors as unimportant blandishments and routine gloss that is perforce included in annual reports written by those responsible for the corporation's performance. The materiality of these statements is further undermined by the occasional caveat warning that stellar results may not always be attainable. But by accompanying the representations of optimism with explanations of the sources of the corporation's strength and with evidence (in the form of dividends) that the corporation itself was acting on the assumption of continuing favorable results, First Chicago gave these statements more than enough bite to constitute predictions actionable under section 10(b) and rule 10b–5. In paragraph 64 of the complaint, for example, defendants are quoted as emphasizing that "[s]trong credit management and a strong balance sheet, financial discipline in a consolidating marketplace, strong market positions, and sound business plans are some of First Chicago's greatest strengths going forward. We believe that they will be the key in the 1990s to achieving our commitment of creating and enhancing shareholder value." Elsewhere in that paragraph, defendants expand upon the sources behind its projected success:

> Our goals are clearly defined. Our execution capabilities are strong. And our excellence in relationship banking and credit risk assessment, coupled with rapidly improving product skills, make us confident that First Chicago will experience continued success and achievement in the 1990s.

Plaintiffs cite three instances, moreover, in which defendants point to increased dividends as tangible evidence of their confidence. We simply cannot conclude as a matter of law at this time that defendants' forward-looking statements would not be considered by an investor deciding whether to buy or sell First Chicago shares.

■ Having survived the materiality inquiry, a prediction or expression of optimism is actionable if the statement was not made in good faith: if the speaker did not genuinely believe the statement to be true or was aware of undisclosed facts that tended seriously to undermine that accuracy of the statement. *See Fisher v. Samuels*, 691 F.Supp. 63, 69 (N.D.Ill.1988); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990); *Salit v. Centerbank*, 767 F.Supp. 429 (D.Conn.1990). Predictions that are supported by a reasonable basis are not actionable. *See In re Warner Communications Sec. Litig.*, 618 F.Supp. 735, 742 (S.D.N.Y.1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986); 17 C.F.R. § 230.175 (1990). There can be little doubt here that plaintiffs adequately allege, for 12(b)(6) purposes, that at least one of the implied factual assertions was inaccurate: in paragraph 74(b), they explicitly assert that defendants "misrepresented that they were 'confident'" of First Chicago's future, and elsewhere they attack defendants representations, on which the projections relied in part, of excellent credit quality and management. Again, we are not examining the pleading through 9(b)'s particularity filter; rule 12(b)(6) requires dismissal only if it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

### C. Dismissal on Rule 9(b) Grounds

■ For most claims of relief, the Federal Rules of Civil Procedure require that a plaintiff provide in his complaint only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). When the cause of action includes allegations of fraud or mistake, however, rule 9(b) imposes the additional requirement that the "circumstances constituting fraud or mistake shall be stated with particularity." Three purposes are served by this heightened standard: (1) the filing of "strike suits" or complaints as pretexts for the discovery of unknown wrongs is inhibited; (2) defendants are protected from the harm that results from charges of serious wrongdoing; and (3) defendants are ensured notice of the conduct complained of, enabling them to prepare a defense. *Coronet Ins.*

*Co. v. Seyfarth,* 665 F.Supp. 661, 666 (N.D.Ill.1987) (citations omitted); *see also Haft v. Eastland Financial Corp.,* 755 F.Supp. 1123, 1127 (D.R.I.1991); *Cooperman v. One Bancorp,* 135 F.R.D. 9, 13 (D.Me.1991).

In *DiLeo,* the Seventh Circuit fleshed out the particularity requirement, explaining that "the who, what, when, where, and how" must be alleged so that the complaint reads like "the first paragraph of any newspaper story." 901 F.2d at 627. Although lengthy quotations from statements of the defendants may provide quite specific information as to time, place, content, and speaker, such technical compliance does not satisfy rule 9(b)'s edict in the securities fraud context. *See Haft,* 755 F.Supp. at 1127; *Cooperman,* 135 F.R.D. at 13; *Abrahamson v. Western Savings and Loan Ass'n,* No. 86–1677 (D.Ariz. 1989); *Alfus,* 745 F.Supp. at 1519.[4] Rather, when a complaint is based, as here, on information and belief, rule 9(b) requires that the complaint set forth the facts on which the belief is founded. *See Haft,* 755 F.Supp. at 1130; *Cooperman,* 135 F.R.D. at 12–13. A plaintiff alleging securities fraud cannot simply quote verbatim from annual reports and press releases and assert that the statements are untrue; he must explain in his complaint *"what* is untrue about each of the challenged statements." *Loan v. Fed. Deposit Ins. Corp.,* 717 F.Supp. 964, 967 (D.Mass.1989) (emphasis added); *Haft,* 755 F.Supp. at 1128; *Akerman v. Bankworcester Corp.,* 751 F.Supp. 11, 12 (D.Mass.1990); *Abrahamson,* No. 86–1677; *cf. Craftmatic,* 890 F.2d at 646 (when factual information is exclusively within the knowledge or control of the defendant, plaintiff must indicate "why the charges ... are not baseless and why

additional information lies exclusively within defendants' control").

With one exception, plaintiffs' allegations of misrepresentations and omissions in paragraphs 73 and 74 are, in essence, merely conclusory assertions that defendants' statements quoted in paragraphs 18 through 72 of the complaint are false; plaintiffs do little more than assert that the quotations were misrepresentations. Vague and conclusory allegations that the defendant's representations were not true, however, are insufficient for 9(b) purposes. *See Akerman,* 751 F.Supp. at 13 (plaintiff must offer more than simple allegations that each quoted passage was a misrepresentation or omission of material fact); *Loan,* 717 F.Supp. at 967; *Robin v. Arthur Young & Co.,* 915 F.2d 1120, 1127 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991); *Denny v. Barber,* 576 F.2d 465, 469–70 (2d Cir.1978); *Abrahamson,* No. 86–1677; *cf. Christidis v. First Pennsylvania Mortgage Trust,* 717 F.2d 96, 98 (3d Cir.1983) (assertion of inadequate loan loss reserves deficient where complaint is silent about the method of estimating reserves or the manner in which that method departed from reasonable accounting practices). Indeed, if a plaintiff needed only to quote statements from a corporation's annual report and allege that those statements were misrepresentations, anyone with a copy of a corporation's reports who was willing to pay the court filing fee could sustain a complaint of securities fraud against any corporation with declining fortunes.

The chronological organization of the complaint seems to suggest that the plaintiffs infer fraud from the close juxtaposition of the favorable reports with the inauspicious revelations during the spring

---

**4.** A line of authority, which is embraced by plaintiffs, adopts a much more lenient standard for particularity in the securities fraud context. These cases do not seem to require an explanation of why the allegedly fraudulent statements of the defendants, which are quoted verbatim and extensively and precisely identified as to time and context, are untrue. *See, e.g., Nicholas v. Poughkeepsie Savings Bank/FSB,* [Current] Fed.Sec.L.Rep. ¶ 95,606 at 97,839, 1990 WL 145154 (S.D.N.Y.1990) ("allegations of false and

misleading statements, who made them, when they were made, and how they were disseminated are sufficient"); *In re Midlantic Corporation Shareholder Litigation,* 758 F.Supp. 226 (D.N.J.1990). The relaxed standard espoused in these cases, however, seems to contravene the mandate of the *DiLeo* strain of cases, which requires a more rigorous explanation of why the plaintiff believes that the defendant's statements are fraudulent, and we are bound by *DiLeo.*

of 1990, an impression that is confirmed by certain language in the complaint (*see* ¶ 67 ("in a dramatic departure from prior favorable reports of operating results," serious problems in the real estate loan portfolio were announced on March 29, 1990)). Mere temporal proximity between statements stressing the strengths of a corporation and touting its successes and announcements of poor economic performance and depressed earnings does not give rise to an inference that the earlier statements were false, however, *see DiLeo*, 901 F.2d at 627–28; *Salit*, 767 F.Supp. 429; *Gollomp*, 756 F.Supp. at 231–32; *Wilkes v. Heritage Bancorp, Inc.*, No. 90–11151–F, 1990 WL 263612 at 10–11 (D.Mass. Nov. 21, 1990); it is well-settled that "fraud by hindsight" is not actionable. *See Denny*, 576 F.2d at 470.

■ The one exception in the complaint to the pattern of conclusory allegations of misrepresentation is plaintiffs' assertion that First Chicago "had initiated a substantial real estate loan in excess of $200 million to the VMS Realty partners without adequate collateral, guarantees, or assurances that it could be syndicated" (Complaint ¶ 74(g); *see also* ¶¶ 73; 74(a)). Although this allegation comes close to satisfying 9(b)'s particularity requirement by specifying a particular speculative and risky transaction, *see Denny*, 576 F.2d at 470, and listing—albeit in a conclusory manner—the facts on which the belief that this transaction was problematic is founded, *see One Bancorp*, 135 F.R.D. at 14, it alone cannot support plaintiffs' much broader allegations of false and misleading statements and omissions regarding the quality of First Chicago's loan portfolios, its conservative lending policies and rigorous credit management, and its confidence that it would achieve its financial goals. The total value of the VMS loan, plaintiffs allege in their complaint, was some figure "in excess of $200 million." Even assuming a figure as large as $250 million, which allows a 25% surplus to account for the "in excess" language, that loan is dwarfed by the immense size of First Chicago's real estate loan portfolio ($4.472 billion at the end of 1989 (Defendants' Ex. 0 at 33)) and

even more by First Chicago's total commercial loan exposure ($20.561 billion at the end of 1989 (*id.*)).

Further, the allegation that that particular transaction was unduly risky cannot survive defendants' rule 9(b) challenge because plaintiffs have failed to plead sufficient facts to give rise to an inference that defendant was aware of the problems with the VMS loan. Rule 9(b) relaxes the pleading requirement for "malice, intent, knowledge, and other condition of mind," permitting those elements to be "averred generally," but the Seventh Circuit nevertheless instructs that " 'the complaint must afford a basis for believing that plaintiffs could prove scienter.' " *Robin*, 915 F.2d at 1127 (quoting *DiLeo*, 901 F.2d at 629); *see also Connecticut National Bank v. Fluor Corporation*, 808 F.2d 957, 962 (2d Cir.1987) (Second Circuit: must "provide at least a minimal factual basis for ... conclusory allegations of scienter"); *Kas v. The Chase Manhattan Bank*, [1990 Transfer Binder] Fed.Sec.L.Rep. ¶ 95,381 at 96,864, 1990 WL 113185 (S.D.N.Y.1990); *Alfus*, 745 F.Supp. at 1519 (Ninth Circuit). Conclusory allegations that the defendants knew that their statements were not true or recklessly disregarded whether the statements were true will not satisfy rule 9(b). *Robin*, 915 F.2d at 1127.

To distinguish their claim that the VMS loan was risky and that the failure to disclose the problems constitutes fraud from an allegation of mere mismanagement or fraud by hindsight, then, plaintiffs here must allege some facts that would permit an inference that defendants knew that the loan had been initiated without adequate collateral, guarantees, or assurances that it could be syndicated, or that it had become unduly risky. To be sure, plaintiffs need not allege in their complaint the existence of a "smoking-gun" memorandum, but they at least must give some indication of why the problems with the loan were so apparent and so profound that they should have been explicitly revealed to shareholder, the loan loss reserve should have been increased according to reasonable accounting practices, the effectiveness of First Chi-

cago's entire credit management policy was in question, and defendants' statements of optimism were not made in good faith. *See DiLeo,* 901 F.2d at 627; *Gollomp,* 756 F.Supp. at 231.

If a plaintiff cannot provide direct evidence of scienter, he may nevertheless establish the requisite mental element circumstantially, either by alleging that the fraud was in the interest of the defendants, *see Robin,* 915 F.2d at 1127, or by other "circumstances indicating conscious behavior by the defendant," *see Kas,* [1990 Transfer Binder] Fed.Sec.L.Rep. at 96,864; where the fraud is shown to be irrational, however, the circumstantial evidence must be stronger, *see id.,* and again it is insufficient to rely on positive reports followed by a poor performance. *See Salit,* 767 F.Supp. 429. Plaintiffs have failed to give any credible indication of motive in either their complaint or their response to defendants' motion. In a footnote, they merely assert that, despite two of the defendants' purchase of First Chicago stock during the class period, those defendants each owned substantially more First Chicago common stock before the class period, and they "had a financial incentive to inflate the value of those holdings and to preserve their substantial compensation from employment with First Chicago" (Plaintiffs' Response at 21, n. 2). But plaintiffs do not allege that the defendants sold any of their shares before the prices dropped, and certainly their jobs with the corporation are jeopardized more by a failure to abide by First Chicago procedures (extending an un-

duly risky loan and not writing it off soon enough) than by a smaller real estate loan portfolio or depressed earnings earlier rather than later. No other circumstances suggesting scienter are offered by plaintiffs.

Despite the extensive compilation of quotations in the complaint, plaintiffs' allegations simply do not offer enough information to establish that their claims of fraud are not baseless. Mindful of the Seventh Circuit's apparent strict interpretation of rule 9(b) as reflected in its *DiLeo* opinion, we must dismiss Count I of plaintiffs' complaint, although we dismiss it without prejudice and grant plaintiffs leave to amend within 30 days.[5]

## II. *Section 11 Allegations*

Count II of the complaint incorporates the general allegations of ¶¶ 1 through 74 and the Count I allegations of ¶¶ 75 through 80. Asserting that the registration statement issued in connection with an offering of First Chicago common shares to Ravenswood shareholders in exchange for Ravenswood common stock was inaccurate, misleading, and omitted material facts, plaintiff Harris, on behalf of the subclass of persons who acquired shares of First Chicago stock in exchange for Ravenswood common stock, claims a violation of Section 11 of the Securities Act of 1933, which prohibits misleading information contained in a securities registration statement or prospectus.[6] Plaintiff Harris also asserts liability under section 15 of the 1933 Act in Count IV of the complaint.[7] Unlike

5. Count III of the complaint asserts a cause of action under § 20 of the 1934 Securities and Exchange Act, 15 U.S.C. § 78t (1988), which imposes liability on every person who "controls any person liable under any provision of this chapter or of any rule or regulation thereunder." Because liability under § 20 is—in this case—dependent on whether Count I states a violation of § 10(b) or rule 10b–5, and because plaintiffs' section 10(b) claims must be dismissed, Count III "sinks," without prejudice, as well.

6. Section 11 provides, in relevant part:
    In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the state-

ments therein not misleading, any person acquiring such security ... may ... sue—
    1) every person who signed the registration statement;
    2) every person who was a director of ... or partner in the issuer at the time of the filing ...;
    3) every person who ... is named in the registration statement as being ... a director, person performing similar functions, or partner; ....
15 U.S.C. § 77k (1988).

7. Section 15 of the Securities Act of 1933 provides for secondary liability for "[e]very person who, by or through stock ownership, agency, or otherwise, ... controls any person liable under [§ 11] or [§ 12]" of the 1933 Act. 15 U.S.C. § 77o (1988). Plaintiffs assert no independent

section 10(b) and rule 10b–5, section 11 does not contain a scienter requirement; rather, liability is established whenever a plaintiff can establish "that he purchased a security that was part of a registered offering and the registration statement contained a material misstatement or omission." *In re Consumers Power Co. Sec. Litig.*, 105 F.R.D. 583, 594 (E.D.Mich.1985).

Defendants argue that Counts II and IV are fatally flawed because, while they allege by incorporation *all of the preceding* allegations, many of those statements are drawn from documents and reports are completely unrelated to the Ravenswood Registration Statement, and of the remaining allegations, plaintiffs have not adequately indicated what was misrepresented or omitted. We agree with defendants that plaintiffs should have been more careful in drafting Counts II and IV of their complaint. The Ravenswood Prospectus incorporates by reference only First Chicago's 1988 10–K form and the 10–Q form for the first quarter of 1989 (Defendants' Reply Ex. G at 3); although plaintiffs claim that a press release announcing First Chicago's operating results for the second quarter of 1989 was also incorporated by reference, we find no indication that any such statement was included in the prospectus.[8] The substantive allegations that could appropriately have been realleged for Counts II and IV, then, are paragraphs 31 through 35 (1988 10–K form), 40 (first quarter 1989 10–Q form), and 47, 38, and 53 (Ravenswood offering). Paragraphs 24, 28, 29, and 30 contain allegations relating to the 1988 Annual Report, but without more information, we cannot know whether the statements quoted were incorporated in the 1988 10–K form or whether they were contained in nonincorporated sections of the Annual Report.

Plaintiffs' overinclusiveness with respect to their reallegations alone do not condemn Counts II and IV, for it is not difficult—especially for defendants, who issued the

prospectus in the first place—to parse away the irrelevant allegations. More troubling, however, is plaintiffs' explanation of what statements in the prospectus are misleading or untrue. Plaintiffs concede, in their memorandum, that eight of the twelve subsections of paragraph 74 of the complaint do not apply to Counts II and IV of the complaint; their insistence that ¶¶ 74(a), (c), (g), and (h) apply with full force in the section 11 context, however, is premised on their position that the entirety of the 1988 Annual Report was incorporated in the prospectus. We are unsure exactly which paragraphs plaintiffs now maintain apply in light of the irrelevance of any statement that was not made part of the 1988 10–K form. We therefore dismiss Counts II and IV without prejudice but with leave to amend the complaint to state more precisely which statements they believe were misleading or untrue and what was allegedly misrepresented or omitted.

On top of this deficiency, defendants argue, the section 11 claims are not cognizable under the securities laws because they allege nothing more that the failure to disclose First Chicago's mismanagement. At the threshold, we question whether the *Santa Fe* decision applies in this context, for the Supreme Court in that case stressed the lack of manipulation or deception, observing that there was no indication that Congress, through section 10(b), meant to prohibit any conduct that was not manipulative or deceptive. *See* 430 U.S. at 472–73, 97 S.Ct. at 1300–01. Because section 11 liability is "virtually absolute, even for innocent misstatements," *In re Consumers Power*, 105 F.R.D. at 594, requiring an element of manipulation or deception would alter the essence of section 11. By analogy to *Santa Fe*, one could argue that an allegation of corporate mismanagement or a breach of fiduciary duty is not actionable under section 11 absent some sort of misrepresentation or untrue statement, but plaintiffs here certainly allege enough actu-

---

allegations of wrongdoing in this count, and therefore liability under § 15 in this case is wholly dependent on § 11 liability.

8. The prospectus does discuss First Chicago's financial results for the first half of 1989 (Defendants' Reply Ex. G at 33–35) but nowhere incorporates any press releases or official announcements of these results.

al statements that they claim to be false to survive this modified *Santa Fe* inquiry.

## CONCLUSION

For the foregoing reasons, plaintiffs' complaint is dismissed without prejudice. Leave to amend the complaint within 30 days is granted.