In re **FIRST CHICAGO CORPORATION SECURITIES LITIGATION.**

Jerome **HARRIS,** individually, and on behalf of all others similarly situated, Plaintiff,

v.

**FIRST CHICAGO CORPORATION,** First National Bank of Chicago, Barry F. Sullivan, Richard L. Thomas and William J. McDonough, Defendants.

No. 90 C 1899.
Related Cases: Nos. 90
C 2139, 90 C 2242.

United States District Court,
N.D. Illinois, E.D.

March 17, 1992.

Michael David Craig and Richard S. Schiffrin, Schiffrin & Craig, Ltd., Buffalo Grove, Ill., for plaintiff.

John Charles Simons and Lynn Adrian Goldstein, First Nat. Bank of Chicago, Chicago, Ill., for defendants First Chicago Corp. and First Nat. Bank of Chicago.

Charles William Douglas, David Robert Stewart and Walter C. Carlson, Sidley & Austin, Chicago, Ill., for Barry F. Sullivan, Richard L. Thomas and William J. McDonough.

## MEMORANDUM AND ORDER

MORAN, Chief Judge.

After we dismissed without prejudice the original complaint, plaintiff Jerome Harris, on behalf of himself and all others similarly situated, filed this amended complaint against First Chicago Corporation (First Chicago) and its officers and directors,[1] alleging violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and the Securities and Exchange Commission Rule 10b–5, 17 C.F.R. 240.10b–5, and Section 20 of the Securities Exchange Act, 15 U.S.C. § 78t. Before us now is defendants' motion to dismiss pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. For the reasons set forth below, we grant defendants' motion.

1. These defendants include Barry F. Sullivan, chairman of First Chicago's board of directors; Richard L. Thomas, president, principal operating officer and director; and William J. McDonough, vice-chairman of First Chicago.

## BACKGROUND

The original complaint was filed by Edward J. Kunze, Rodney B. Shields and Harris, on behalf of persons acquiring First Chicago common stock through purchase on the open market or in exchange for Ravenswood Financial Corp. (Ravenswood) common stock between January 13, 1989 and March 29, 1990. It charged First Chicago and its officers and directors with knowingly and recklessly misrepresenting the health of the corporation. In our memorandum and order of May 1, 1991, *In re First Chicago Corp. Secur. Litigation*, 769 F.Supp. 1444, (N.D.Ill.), we summarized these charges.[2] As a recap, plaintiffs charged defendants with making fraudulent statements in various press releases, letters to shareholders, annual and quarterly financial reports, and in dividend announcements. More specifically, plaintiffs cited First Chicago's 1988 annual report, which boasted the corporation's high performance and included statements downplaying minor setbacks in the third quarter of 1989. Plaintiffs also attacked several statements by defendants lauding their credit management process as being strict and disciplined. Defendants stated that loan portfolios and credit risks were closely monitored and continually reviewed, and that estimates of losses were made quarterly in order to properly assess the adequacy of the allowance for credit losses. First Chicago attributed much of its 1988 success and its overall strength to this process. Although defendants described their highly leveraged transaction portfolio as requiring special attention, they stated that rigorous top management and their conservative practices with respect to the portfolio made them confident that these loans did not present excessive risks to the shareholders. In their real estate portfolio defendants again admitted that special attention was required but, as in the highly leveraged transaction portfolio, exposure and risk were considered minimal because

2. Our rendition of these charges is located in 769 F.Supp. at 1445–48.

of their strict lending practices. Plaintiffs alleged that defendants failed to disclose that their commercial loans were not diversified, as touted, but instead were concentrated in risky transactions. As an example, plaintiffs cited a $200 million loan to VMS Realty Partners (VMS), one of the nation's largest real estate firms, which plaintiffs claimed was initiated without adequate collateral, guarantees, or assurances that it could be syndicated.

Defendants made statements expressing their aggressive approach to handling specific credit problems in their loan portfolio. Their financial report for the second quarter of 1989 was very optimistic about First Chicago's continued progress toward its financial goals. Consistent with this optimism, they announced two stock dividend increases in 1989. These statements, plaintiffs asserted, were "[w]ith knowledge or reckless disregard of the true financial and operating condition of First Chicago...." 769 F.Supp. at 1448. On March 29, 1990, the outlook was not so optimistic. First Chicago announced serious problems in its real estate portfolio which caused the loan loss reserve for the first quarter of 1990 to triple to between $150–$160 million. Also, the net income for the quarter would be 50 per cent of the 1989 level. It was estimated that non-performing assets would rise about 15 per cent from the 1989 year-end level of $1.1 billion.

Although we considered plaintiffs' allegations sufficient to withstand a motion to dismiss under Rule 12(b)(6),[3] the complaint failed under the more rigorous standard of Rule 9(b), which requires that "circumstances constituting fraud or mistake [to] be stated with particularity." The rule serves three purposes: "(1) the filing of 'strike suits' or complaints as pretexts for the discovery of unknown wrongs is inhibited; (2) defendants are protected from the harm that results from charges of serious wrongdoing; and (3) defendants are ensured notice of the conduct complained of,

enabling them to prepare a defense." 769 F.Supp. at 1452–53 (citing *Coronet Ins. Co. v. Seyfarth,* 665 F.Supp. 661, 666 (N.D.Ill. 1987)).

In *DiLeo v. Ernst & Young,* 901 F.2d 624 (7th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990), the court explained that Rule 9(b) requires a showing of "the who, what, when, where, and how," so that the complaint reads like "the first paragraph of any newspaper story." *Id.* at 627. Applying *DiLeo* to the original complaint, we stated that "[w]ith one exception, plaintiffs' allegations of misrepresentations and omissions in paragraphs 73 and 74 are, in essence, merely conclusory assertions that defendants' statements ... are false." 769 F.Supp. at 1453. The one exception to plaintiffs' otherwise conclusory allegations was the $200 million loan to VMS, which plaintiffs claimed was made "without adequate collateral, guarantees, or assurances that it could be syndicated." This claim, we stated, was close to satisfying Rule 9(b)'s particularity requirement because it involved a particular speculative and risky transaction. Nevertheless, the allegation fell short of supporting "plaintiffs' much broader allegations of false and misleading statements and omissions regarding the quality of First Chicago's loan portfolios, its conservative lending policies and rigorous credit management, and its confidence that it would achieve its financial goals." 769 F.Supp. at 1454. This was largely because the $200 million VMS loan was only a small portion of First Chicago's real estate portfolio ($4.472 billion at the end of 1989) and its total commercial loan exposure ($20.561 billion at the end of 1989).

In order for plaintiffs to survive Rule 9(b) scrutiny, we stated that they

> at least must give some indication of why the problems with the loan were so apparent and so profound that they should have been explicitly revealed to the

---

**3.** As we explained in our previous opinion, Rule 12(b)(6) requires us to accept plaintiffs' allegations as true and to grant defendants' motion "only if it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 769 F.Supp. at 1452. Because plaintiffs' allegations easily met this lenient standard, we proceeded to the Rule 9(b) analysis.

shareholder, the loan loss reserve should have been increased according to reasonable accounting practices, the effectiveness of First Chicago's entire credit management policy was in question, and defendants' statements of optimism were not made in good faith.

769 F.Supp. at 1454–55 (citing *DiLeo*, 901 F.2d at 627).

We also explained that plaintiffs could meet Rule 9(b)'s requirement by establishing scienter circumstantially, *i.e.*, by showing that the fraud was in defendants' interests, or by other "circumstances indicating conscious behavior by defendant." 769 F.Supp. at 1455. Because plaintiffs failed to show directly or indirectly that their claims were not baseless, we dismissed the complaint without prejudice.

## DISCUSSION

In an attempt to cure the deficiencies of the original complaint plaintiff Harris filed the amended complaint.[4] This complaint, being much narrower in scope, is on behalf of persons acquiring First Chicago's common stock between October 13, 1989 and March 29, 1990.[5] It focuses on the VMS transaction, charging, in essence, that First Chicago failed to adequately increase its loan loss reserve during the third and fourth quarters of 1989 to account for the increased risk of the loan. Delaying the increase of the loan loss reserve until the first quarter of 1990, according to plaintiff, "had the effect of increasing materially the earnings reported by First Chicago and, in turn, caused First Chicago's stock price to be inflated" (am.cplt. ¶ 1).

To shore up his Rule 10(b)(5) claim, plaintiff attempts to establish scienter by showing a self-interest on the part of defendants in delaying the loan loss increase. Plaintiff alleges that defendants' motive for the delay was to increase First Chicago's 1989 earnings in order to increase their executive bonus compensation, which is tied, in substantial part, to company earnings (am. cplt. ¶ 1).[6]

The allegations in the amended complaint center around the financial woes of VMS. On November 14, 1989, VMS first announced that it experienced cash flow problems during the third quarter, resulting in its taking a $110 million write-down in the value of certain real estate properties and receivables—but that it would still have a net worth of $300 million. Also, it announced a major shakeup in its top management, including the replacement of its CEO and president. VMS also disclosed that its parent company, Xerox Credit Corporation, would issue $125 million in financial backing to the ailing real estate firm. VMS retained an in-house investment adviser to handle major refinancing of certain properties. VMS and its affiliates decided to dispose of certain real estate assets and to renegotiate lending agreements.

Plaintiff does not allege, however, that First Chicago's loan to VMS was put directly in jeopardy by these announcements, whether by inadequate collateral, delinquent payments or by a plea from VMS to renegotiate its debt with First Chicago. Plaintiff's claim can be summed up as follows: whether the defendants committed securities fraud violations by reserving the VMS loan in the first quarter of 1990, as opposed to the third or fourth quarter of 1989. It must be more than a question of timing in order to take the matter outside the business judgment rule and into the domain of Rule 10(b)(5). *DiLeo*, 901 F.2d at 627. We know from *DiLeo* that a failure to increase loan loss reserves can

---

**4.** The two additional named plaintiffs in the original complaint, Edward J. Kunze and Rodney B. Shields, have dropped out of this litigation.

**5.** On October 13, 1989, First Chicago issued a press release announcing its third quarter results. As mentioned earlier, on March 29, 1990, First Chicago announced that a $160 million loan loss provision would be required for the first quarter of 1990, due to the loans to VMS.

**6.** According to the amended complaint, through First Chicago's Officer Incentive Program, defendants Sullivan, Thomas and McDonald, received $775,000, $500,000 and $200,000, respectively, in bonus compensation. In 1989 the defendants received cash and common stock through First Chicago's Strategic Stock Incentive Plan, which also was partly derived from year-end earnings (am.cplt. ¶¶ 7–11).

amount to fraud if the problem with the loan was "so apparent." Therefore, we must determine if the problems with the VMS loan were "so apparent" at the time of the alleged fraud. According to Harris, defendants committed fraud by failing to increase their loan loss reserve to account for VMS' troubles on October 13, 1989 (press release announcing third quarter results—am.cplt. ¶ 24), November 13, 1989 (Form 10–Q for third quarter—am.cplt. ¶ 25), January 15, 1990 (press release announcing fourth quarter results—am.cplt. ¶ 30), March 14, 1990 (press release stating First Chicago knew of no reason to account for recent activity in its common stock trading) and March 19, 1990 (Form 10–K and 1989 Annual Report—am.cplt. ¶ 34).

■ Harris acquired his First Chicago common stock through a merger with Ravenswood, which was effective on November 1, 1989, some two weeks before VMS' announcement. It is for this reason that Harris, as a former Ravenswood stockholder, cannot prevail under the federal securities laws. Rule 10(b)(5) requires a plaintiff to show that the defendant "(1) made an untrue statement of material fact or omitted a material fact that rendered the statements made misleading, (2) *in connection with a securities transaction*, (3) with the intent to mislead, and (4) which caused plaintiff's loss." *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 943 (7th Cir.1989) (emphasis added).[7] Those persons, like Harris, acquiring First Chicago stock through the Ravenswood merger on November 1, 1989, simply lack standing to satisfy the "in connection with" language of Rule 10b–5. "To satisfy the 'in connection with' language of § 10(b) and Rule 10b–5, a plaintiff must show a causal connection between his decision to buy or sell securities and the defendant's fraudulent conduct." *Craig v.*

*First American Capital Resources, Inc.*, 740 F.Supp. 530, 535 (N.D.Ill.1990) (citing *Schlifke*, 866 F.2d at 943). *See also McGrath v. Zenith Radio Corp.*, 651 F.2d 458, 467 (7th Cir.1981), *cert. denied*, 454 U.S. 835, 102 S.Ct. 136, 70 L.Ed.2d 114 (1981) ("in connection with" requirement satisfied if "fraud may be said to 'touch' the transaction involving the purchase").

In an effort to satisfy Rule 10b–5's causation requirement in regard to the Ravenswood merger of November 1, 1989, plaintiff offers defendants' October 13, 1989 press release—the only statement cited in the amended complaint that theoretically could have been, in terms of timing, "in connection with" the merger. This effort fails. Plaintiff offers only that defendants must have had access to non-public information concerning VMS' troubles on October 13, 1989. "The question is not merely whether the Bank had knowledge of the undisclosed facts; rather, it is the *'danger of misleading buyers* [that] must be actually known or so obvious that any reasonable man would be legally bound as knowing'". *Schlifke*, 866 F.2d at 946 (quoting *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977), *cert. denied*, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977) (emphasis added).

Plaintiff's theory of recovery suffers from several incurable defects. First of all, the allegations are simply insufficient to infer that First Chicago had access to non-public information concerning the plight of VMS one month before the VMS public announcement on November 14, 1989, information that was so material to the well-being of First Chicago that it had a duty to disclose it even if VMS did not. "Although states of mind may be pleaded generally under Fed.R.Civ.P. 9(b), the rule

---

7. Rule 10b–5 provides:
   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
   (a) to employ any device, scheme, or artifice to defraud,
   (b) to make any untrue statement of a material fact or to omit to state a material fact

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
   (c) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b–5.

requires plaintiffs to plead 'with particularity' any 'circumstances constituting fraud.' ... 'the complaint must still afford a basis for believing that plaintiffs could prove scienter.'" *Robin v. Arthur Young & Co.*, 915 F.2d 1120, 1127 (7th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991) (citing *DiLeo,* 901 F.2d at 627, 629). The amended complaint leaves us without such a basis. We are asked to infer that VMS advised First Chicago, a month before its own public disclosure, of such devastating financial reverses that they jeopardized the bank's likelihood of ever recovering upon its VMS loans; that VMS otherwise concealed that information from the public; that First Chicago acquiesced in that concealment; and that the bank in October was well aware that VMS' difficulties were considerably greater than those disclosed on November 14. Those inferences are, however, in the realm of speculation.

■ Secondly, even if we assume First Chicago was privy to some amount of non-public information, plaintiff has offered nothing that would permit an inference that the Ravenswood stockholders' decision to merge with First Chicago—adopted on September 7, 1989—was "in connection with" the October 13, 1989 press release. This five-week differential belies any alleged causation on the part of the Ravenswood stockholders. In short, post-sale misrepresentations are not enough to satisfy 10b–5.[8] *Craig,* 740 F.Supp. at 535–36. *See also Denny v. Barber,* 576 F.2d 465, 468–69 (2d Cir.1978). Because the former Ravenswood shareholders cannot prevail under 10b–5 in this action, defendants' motion is granted with prejudice.[9]

### CONCLUSION

Plaintiff Harris, as a former Ravenswood stockholder, lacks standing to sue defendants for securities fraud in this ac-

tion. Therefore, we grant defendants' motion to dismiss the amended complaint with prejudice.

---

8. As in our previous opinion, plaintiff's Section 20 claim for controlling person liability, since predicated on 10b–5 liability, must also fail.

9. This suit is dismissed in its entirety. However, our holding only reaches those persons acquiring First Chicago common stock via the Ravenswood merger. With the dismissal of

Harris from this suit there are no other named plaintiffs who could properly represent the interest of persons who might have a stake in any future litigation. We decline, as we must, to pass on the merits of any subsequent filing in this matter. *See Denny,* 576 F.2d at 468–69.