## In re BALLY MANUFACTURING SECURITIES CORPORATION LITIGATION.

### Nos. 90 C 6057, 90 C 6235, 90 C 6265, 90 C 6592 and 91 C 2540.

United States District Court,
N.D. Illinois, E.D.

Feb. 4, 1992.

---

Marvin A. Miller, Patrick E. Cafferty, Chertow & Miller, Terry Rose Saunders, Susman Saunders & Buehler, Michael David Craig, Richard S. Schiffrin, Schiffrin & Craig, Chicago, Ill., Mark C. Gardy, Lee Squitieri, Abbey & Ellis, Jonathan Plasse, Goodkind, Labaton & Rudoff, Jeffrey Squire, Kaufman, Malchman, Kaufman & Kirby, New York City, for plaintiffs.

Jerald S. Solovy, William Denby Heinz, Norman M. Hirsch, C. John Koch, and Patricia Bronte, Jenner & Block, Chicago, Ill., and Dennis J. Block and Joseph S. Allerhand, Weil, Gotshal & Manges, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiffs David Arazie, Gary Hurlick, Paul Karinsky, William and Ann Klein, Aldo Mirizzi, Lawrence and Florence Moss, Kevin O'Sullivan, Jeffrey Starr, and Arthur Yorkes bring this action against defendants Robert E. Mullane, Roger Keesee, Paul J. Johnson, Patrick L. O'Malley, William E. Chandler, and Bally Manufacturing Co. (collectively, "Bally" or "company").[1] They allege that Bally misrepresented and fraudulently concealed the true financial health of the company in violation of state

---

1. We take the plaintiffs' names from the amended class action complaint, although we note alternative spellings for some throughout both parties' papers. Additionally, Bally contends that plaintiff Hurlick has agreed to dismiss his claim as a named representative, Response to Class Certification Motion ·at 1 n. 2, although plaintiffs' reply maintains that there are still eleven representative plaintiffs, Reply at 3 n. 5, which would seem to include Hurlick. Having been provided no documented proof of Hurlick's prior dismissal, we assume, for purposes of deciding the motions before us, that he is still in the case.

and federal law. We have before us plaintiffs' motion for class certification, and Bally's motion to dismiss. For the reasons set forth below, we grant both motions.

## I. Factual Background

Bally is a Delaware corporation headquartered in Illinois. The individual defendants are company officers; some are also directors. During the putative class period, February 24, 1990 to October 11, 1990, defendant Mullane was chairman of the board of directors, and Bally's chief executive officer. He resigned these positions on October 12, 1990. Defendant Keesee was president and chief operating officer of the company, and was also a director. He resigned these positions on November 12, 1990. Defendant Johnson was Bally's vice-president, treasurer, and chief financial officer. He resigned on November 16, 1990. Defendant O'Malley was, and still is, chairman of the company's audit committee, and a director; defendant Chandler, likewise, was and still is a vice president and controller.

The named plaintiffs all purchased Bally stock during the proposed class period, paying, they allege, "prices that were artificially inflated by reason of the materially false and misleading statements and material non-disclosures alleged herein." Amended Class Action Complaint ¶ 5. The seventy-paragraph complaint asserts three causes of action. Count I alleges § 10(b), § 20, and Rule 10b–5 fraud; Count II alleges common law fraud and deceit; and Count III alleges common law negligent misrepresentation.

Bally has three primary business segments. There is a casino hotels segment, which includes the operation of casino hotels in Atlantic City (Bally's Park Place Casino Hotel, and Bally's Grand Hotel), Las Vegas, and Reno. A fitness centers segment operates approximately 310 fitness centers across the country. Finally, a products and services segment designs, produces, and supplies instant ticket lottery games and on-line lottery numbers, and also designs, manufacturers, and distributes gaming and fitness equipment.

The company's two major segments, casino hotels and fitness centers, require substantial capital investment. During 1987, 1988, and 1989, Bally invested $604.6 million in property, plant, and equipment, and another $205.5 million for various acquisitions. These expenditures were highly leveraged; at the end of 1989, Bally's total debt of $1.77 billion was 75% of its capitalization, and both figures had increased since the end of 1988, when they were $1.67 billion and 74%. Plaintiffs allege that, during the proposed class period, Bally "continually assured investors that [the company] could continue to expand and refurbish its facilities and operations and thereby increase its revenues and generate sufficient cash to meet is requirements." *Id.* ¶ 27.

On February 23, 1990, Bally announced its fourth quarter and year ended (1989) financial figures. Plaintiffs quote Mullane as saying:

I am encouraged by the favorable fourth quarter operating results by several companies within our products and services group. Our lottery, fitness equipment and European gaming divisions all posted higher than anticipated revenue and earnings results. The fourth quarter also reflected a revenue increase in our Fitness Center business after slower than expected second and third quarter growth.

... With the completion of the 800–room tower at Bally's Park Place in Atlantic City, and the ongoing remodeling at Bally's Las Vegas, we are well-positioned to meet the needs of our markets as we move into the '90s.

... Despite the recent decline of gaming industry stocks, I feel our previously reported strong cash flow position of approximately $7.00 per share after interest and taxes will reflect favorably on the company's long-term financial and stock market performance.

*Id.* ¶ 28.

In the March 12, 1990 issue of *Crain's Chicago Business*, Mullane said, among other things, "[Bally] is a good business that's not being sold well on Wall Street,"

and "I've done a very poor job of selling the company. We're going to start some selling. We have to. We have a better company than we've been showing." *Id.* ¶ 29.

Plaintiffs cite to several parts of Bally's 1989 Annual Report to Shareholders as evidence tending to show the alleged ongoing fraudulent scheme to artificially prop up share prices. The 1989 Annual Report reveals that Bally planned to spend some $250 million on property, plant, and equipment investments, and business acquisitions. *Id.* ¶ 30; 1989 Annual Report at 19.[2] The Report also "optimistically" (plaintiffs' word) forecasts successful competition with new casino hotel interests in Las Vegas; the new or newly refurbished competitors would increase tourism generally, which would not hurt business at Bally's own "substantially" refurbished casino. Amended Class Action Complaint ¶ 31; 1989 Annual Report at 15. Mullane suggested that "many other positive trends support the growth of our fitness center business...." Amended Class Action Complaint ¶ 32; 1989 Annual Report, Mullane Memorandum at 10. He also promised that the company "will do everything possible in the years ahead to increase the value of your holdings in Bally through higher dividends and share price." Amended Class Action Complaint ¶ 33; 1989 Annual Report, Mullane Memorandum at 10. This, plaintiffs contend, "created a false and misleading impression," which, when coupled with "all the other information available to shareholders and the representation made by defendants, assured investors of the safety of Bally's dividend." Amended Class Action Complaint ¶ 33. The company also said that it "believes that its cash from operations, together with cash expected to be available under various lines of credit, credit agreements and capital transactions will be adequate to meet all of its cash requirements, including debt service." *Id.* ¶ 34; 1989 Annual Report at 20.

On April 27, 1990, Bally announced its financial results for the first quarter of 1990. Commenting on those results, Mullane said that he was confident that "1990 will reflect the benefits of the repositioning of the company during the 1980's." Amended Class Action Complaint ¶ 37.

These statements, plaintiffs allege, "were false and misleading when made and were known to be so by defendants who knew or recklessly disregarded the fact that the statements had no reasonable basis...." *Id.* ¶ 39; *see also id.* ¶ 49.

"[A]s Bally's financial condition continued to deteriorate," plaintiffs claim, "Bally and the individual defendants began to formulate contingency plans to alleviate the Company's financial plight. The public announcements concerning these plans were false and misleading and failed to disclose the true purpose for the plans or the Company's financial condition at the time." *Id.* ¶ 41. *Crain's Chicago Business*, in a June 4, 1990 article, quoted Johnson as saying, "The debt is appropriate to Bally's business. The reality is that it's not too much debt; it's not beyond the capabilities of this company to manage." *Id.* ¶ 43.

Merrill Lynch reported on July 11, 1990 that its analysts doubted Bally could remain solvent "without taking aggressive financial steps." *Id.* ¶ 45. Merrill Lynch also noted that it was "extremely difficult to trace Bally's flow of funds." *Id.* Mullane publicly denounced the report, saying it "was so wrong" and that "[s]omething smells at the same time." *Id.* He maintained that Bally's prospects were excellent. Plaintiffs contend that Mullane knew that "Bally's financial statements and reports obscured and concealed the truth of Bally's financial condition," and therefore felt that "his statements would influence

---

**2.** Bally attached the full text of several reports to its memorandum in support of the motion to dismiss, including the 1989 Annual Report. Plaintiffs quoted from these materials, and rely heavily upon them, but did not furnish copies with their complaint. Although not relevant to the motion for class certification, we are entitled to review them in the context of the motion to dismiss. *In re VMS Sec. Litig.*, 752 F.Supp. 1373, 1394 n. 21 (N.D.Ill.1990) (citing 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1327, at 762–63 (1969) ("when plaintiff fails to introduce a pertinent document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the pleading")).

the market price of Bally's stock and help maintain its artificially inflated price." *Id.*

On July 25, 1990, commenting on second quarter (1990) financial statistics, Mullane said that a modest increase in income from operations "reflect[s] the benefits of the large capital and other investments which have been made in prior periods." *Id.* ¶ 47. He added that "favorable [operating profits] reflect the strength of our basic business segments, each of which performed well in the quarter." He continued:

> It is worth noting that the casino group increased its operating profits over the second quarter of 1989, notwithstanding the new casino openings in Atlantic City and Las Vegas; that the fitness center operations achieved record second quarter profits; and that the products and services group results improved for the sixth consecutive quarter.

*Id.*

On August 20, 1990, Bally released its quarterly 10–Q report, in which it reported that it had sufficient cash resources "to meet all of its cash requirements, including debt service." *Id.* ¶ 48. It disclosed, however, the negative impact newly opened competitor casino hotels, both in Atlantic City and Las Vegas, had on its own casino hotels. *Id.* ¶ 51. The company minimized those disclosures by noting that long-term results do not necessarily track short-term results. *Id.*

In mid-September 1990, New Jersey casino regulators limited Bally's ability to use profits generated at its Atlantic City casinos to service the debts of Bally's other business segments, or for the parent company. *Id.* ¶ 52.

On October 7, 1990, Mullane (according to plaintiffs) "finally admitted publicly what the Individual Defendants had known throughout the Class Period"—namely, "that Bally was experiencing a severe cash crunch and that dividend on its common stock was likely to be suspended despite earlier reported statements that its cash was sufficient to cover its obligations." *Id.* ¶ 54. On October 11, 1990, Mullane reportedly said, "We're not going bankrupt. If you ask if we have $50 million in extra cash, I'd say no. But if you ask whether we can pay our bills, the answer is yes. We've never missed a payment, and I don't foresee that we will." *Id.* ¶ 55.

On October 12, 1990, the very next day, Bally announced that it would suspend payment of dividends on its common stock, and would not make a scheduled October 15, 1990 interest payment. The company's stock fell to $3⅛ per share from a class period high of $10⅝ per share.

## II. Class Certification

Rule 23 of the Federal Rules of Civil Procedure establishes a two-step procedure to determine if a class action is appropriate. The court must first inquire into whether the class meets the four preliminary requirements of Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

Assuming those four requirements are met, a second step entails qualification under one of the three subsections of Rule 23(b). Here, plaintiffs seek class certification under Rule 23(b)(3), which provides that

> the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D)

the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

■ In evaluating the motion for class certification, the allegations made in support of certification are taken as true, and we do not examine the merits of the case. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 2152–53, 40 L.Ed.2d 732 (1974); *Riordan v. Smith Barney,* 113 F.R.D. 60, 62 (N.D.Ill.1986). The burden of showing that the class certification requirements have been met rests with plaintiffs. *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982); *Trotter v. Trotter,* 748 F.2d 1177, 1184 (7th Cir.1984); *Riordan,* 113 F.R.D. at 62.

We reiterate our general belief that "securities fraud cases are uniquely suited to class action treatment since the claims of individual investors are often too small to merit separate law suits. The class action is thus a useful device in which to litigate similar claims as well as an efficient deterrent against corporate wrongdoing." *Ridings v. Canadian Imperial Bank of Commerce Trust Co. (Bahamas), Ltd.,* 94 F.R.D. 147, 150 (N.D.Ill.1982); *accord In re Telesphere Int'l Sec. Litig.,* 753 F.Supp. 716, 717 n. 2 (N.D.Ill.1990) (Shadur, J.).

Bally does not dispute that plaintiffs satisfy Rule 23(a)'s first prerequisite, and we find that numerosity has been shown by plaintiffs.[3] As of March 15, 1990, Bally had more than 16,000 common shareholders of record; while the exact number of class members is not known (and may or may not approach 16,000), common sense dictates that the class "is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1); *see Hochschuler v. G.D. Searle & Co.,* 82 F.R.D. 339, 343 (N.D.Ill.1978) (class of over 1,000 satisfies numerosity requirement).

■ While apparently conceding that plaintiffs satisfy Rule 23(a)(2)'s commonality condition, the company argues that this commonality is not predominant as required by Rule 23(b)(3). Bally contends that, because "there was a great variance in the material information available during the eight-month class period," class members "simply do not have a common position when it comes to proving [their] claim for securities fraud...." Response to Class Certification Motion at 4. Bally cites several cases in support of its position. *See J.H. Cohn & Co. v. American Appraisal Assocs., Inc.,* 628 F.2d 994, 998 (7th Cir.1980); *Zandman v. Joseph,* 102 F.R.D. 924, 929 (N.D.Ind.1984) (relying on *J.H. Cohn* ); *see also Klein v. A.G. Becker Paribas, Inc.,* 109 F.R.D. 646, 653 (S.D.N.Y. 1986); *Gelman v. Westinghouse Elec. Corp.,* 73 F.R.D. 60, 67, 69 (W.D.Pa.1976), *appeal dismissed,* 556 F.2d 699 (3d Cir. 1977).

■ As plaintiffs correctly point out, however, the validity of *J.H. Cohn* for the proposition urged by Bally is questionable at best. There, the Seventh Circuit was concerned with whether to issue a writ of mandamus directing the district court judge to certify the class.[4] The court did not base its opinion on the commonality question, "but on whether the district court's decision to deny class certification constituted an extreme abuse of discretion to warrant the extraordinary remedy of mandamus." *In re VMS Sec. Litig.,* 136 F.R.D. 466, 475 n. 2 (N.D.Ill.1991). Moreover, "*J.H. Cohn* involved written and oral communications extending over three years. [*J.H. Cohn,* 628 F.2d] at 996. Oral misstatements can vary from investor to investor in the way a fraudulent quarterly report cannot. Individual issues are thus much more likely to overwhelm the litigation when the claim turns on oral misrepre-

---

3. Bally also apparently does not dispute the "adequacy of representation" prong of Rule 23(a), except insofar as this issue overlaps typicality, which we address below.

4. An order refusing to certify a class action is not appealable. *J.H. Cohn,* 628 F.2d at 996

(citing *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978); *Anschul v. Sitmar Cruises, Inc.,* 544 F.2d 1364 (7th Cir.) (en banc), *cert. denied,* 429 U.S. 907, 97 S.Ct. 272, 50 L.Ed.2d 189 (1976)).

sentations." *Harman v. Lyphomed, Inc.*, 122 F.R.D. 522, 526 n. 2 (N.D.Ill.1988).

In short, we decline to accord *J.H. Cohn* the significance attached to it by Bally. We are not oblivious to the underlying concerns that might counsel against certifying a class like this one, see, *e.g.*, *Gelman*, 73 F.R.D. at 69, particularly the risk that certification "would expand the litigation beyond all reasonably controlling bounds...." *Id.* That risk is better addressed further down the road, if necessary, by "alter[ing] or amend[ing]" the class, not by denying certification at the outset. *See* Rule 23(c)(1); *see also Harman*, 122 F.R.D. at 527 n. 3.

■ Bally does not put all of its eggs in the commonality basket. It also argues that the putative class does not satisfy the typicality condition of Rule 23(a)(3). The contention is two-pronged: first, Bally maintains that because individual plaintiffs were exposed to differing levels of information, certain plaintiffs may have an incentive to disparage the materiality of disclosures made at other times; second, the company suggests that certain of the named plaintiffs are subject to unique defenses that detract from their role as class representatives.

Typicality is present if "the named representative's claims have the same essential characteristics as the claims of the class at large." *Swanson v. Wabash, Inc.*, 577 F.Supp. 1308, 1323 (N.D.Ill.1983) (citing *De La Fuente v. Stokely–Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir.1983)). Accordingly,

> [a] plaintiff's claims are typical if they arise from the same events or course of conduct giving rise to the claims of other class members and his or her claims are based on the same legal theory. The typicality requirement may be satisfied even if there are factual differences between the plaintiff's claims and the claims of other class members.

*Id.* at 1323–24. Merely because there are "factual distinctions between the claims of the named plaintiffs and those of other class members" does not mean that typicality is not present; "similarity of legal theo-

ry may control even in the face of differences of fact." *De La Fuente*, 713 F.2d at 232.

To the extent that Bally's typicality argument mirrors its commonality discussion (particularly as based on *J.H. Cohn* ), we do not find it persuasive. As in *VMS Securities*, plaintiffs here have alleged a "common course of conduct in which certain defendants allegedly misled all of the ... investors by painting an overly optimistic financial picture...." *In re VMS Securities Litig.*, 136 F.R.D. at 475. This would suggest that typicality is present. *Id.*

Further, we are unpersuaded that the deposition excerpts of certain of the named plaintiffs create such large factual distinctions between class members as to warrant not certifying the class on typicality grounds. Plaintiffs' allegations of injury are fairly straightforward, and "[w]hether [they] and other class members bought early in the Class Period or late, they are all alleged to have been injured by the interrelated misstatements and omissions." *Nicholas v. Poughkeepsie Sav. Bank*, Fed. Sec.L.Rep. (CCH) ¶ 95,606, 1990 WL 145154 (S.D.N.Y.1990). Moreover, without ruling on matters not directly before us, we believe that plaintiff Mirizzi's speculation as to how he might have acted, given certain circumstances, is insufficiently concrete to be of any real use to Bally on the class certification issue. *Cf. Basic, Inc. v. Levinson*, 485 U.S. 224, 245, 108 S.Ct. 978, 990, 99 L.Ed.2d 194 (1988) ("Requiring a plaintiff to show a speculative state of facts, *i.e.*, how he would have acted ... if the misrepresentation had not been made, ... would place an unnecessarily unrealistic burden on the Rule 10b–5 plaintiff who has traded on an impersonal market.").

Bally's unique defenses argument has three parts. First, it contends that named plaintiffs Mirizzi, William and Ann Klein, Arazie, Karinsky, and Lawrence and Florence Moss continued to buy Bally stock during the putative class period even though the price of that stock was declining. "Such action," Bally asserts, "raises a serious question whether [plaintiffs] are relying on the integrity of the

market price." Response to Class Certification Motion at 16.

As plaintiffs point out, however, class representatives are not necessarily required to rely exclusively on the integrity of the market. *Grossman v. Waste Management, Inc.*, 100 F.R.D. 781, 788 (N.D.Ill.1984); *see also Schwartz System Software Assocs., Inc.*, 138 F.R.D. 105, 108 (N:D.Ill.1991) (citing *Grossman* ). Furthermore, in light of the Supreme Court's decision in *Eisen*, delving into a particular named plaintiff's investment strategy at this stage likely would entail an impermissible consideration of the merits of the complaint itself. *Moskowitz v. Lopp*, 128 F.R.D. 624, 631 (E.D.Pa.1989). Discussing typicality in the context of a securities fraud class certification motion similar to the instant motion, the court in *Moskowitz* found that even a named plaintiff who purchased stock pursuant to a strategy of "takeover speculation" is a typical class representative.[5] *Id.* The court noted that "the possible availability of a unique defense does not foreclose class certification, [citation], otherwise the fraud-on-the-market presumption would transmogrify every securities fraud class certification motion into a full-blown attack on the merits." *Id.*[6] Citing *Eisen*, the court found that "[e]xactly what plaintiff relied on in purchasing and selling his shares of Hutton stock is a question of fact which can not be resolved at the class action stage." *Id.*

In short, stock purchases by the named plaintiffs during the proposed class period,[7] even if engineered largely on the basis of an investment strategy such as "takeover speculation" or "averaging down," do not destroy typicality. *Id.; see also Kronfeld v. Trans World Airlines, Inc.*, 104 F.R.D. 50, 53 n. 4 (S.D.N.Y.1984) (purchase of additional shares after certain disclosures by company did not destroy typicality; such purchases are "common investment technique used to decrease the average cost of the investment") (citing *Nye v. Blyth Eastman Dillon & Co.*, 588 F.2d 1189, 1195 n. 6 (8th Cir.1978)).

The second of Bally's three "unique defenses" is directed at plaintiffs Starr, Mirizzi, and Karinsky; the company contends that, because these proposed class representatives had varying degrees of knowledge about the casino industry, Bally's alleged nondisclosure of the full impact of new competition in Las Vegas and Atlantic City is less significant to them than perhaps to other class members. However, Bally does not argue that Starr, Mirizzi, or Karinsky had access to or considered information that was not publicly available and reflected in the market price of Bally stock. A fundamental tenet of the fraud on the market theory is that "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations, therefore,

---

5. Defendant E.F. Hutton Group, Inc. and various E.F. Hutton directors and officers argued that a detailed analysis of plaintiff Moskowitz' trading account revealed that Moskowitz' purchase orders were predicated on "a strategy of employing options, together with simultaneous buy-sell orders, to make profits by focusing not on whatever underlying value may have been reflected in Hutton's stock price, but on short-term price movements caused by possible merger and acquisition activity." *Moskowitz,* 128 F.R.D. at 631.

6. *Basic*'s fraud on the market theory was not intended to severely limit the possibility of securities fraud class actions. Indeed,

> [t]he fraud-on-the-market presumption is applied to establish reliance, not in face-to-face transactions involving closely-held corpora-

tions, but in the impersonal securities exchanges where proof of direct reliance is virtually impossible. [Citation.] It can be stated without fear of gainsay that the [roster of] shareholders of every large, publicly traded corporation includes institutional investors, short-sellers, arbitragers, etc. The fact that these traders have divergent motivations in purchasing shares should *not defeat the* fraud-on-the-market presumption absent convincing proof that price played *no* part whatsoever in their decision making.

*Moskowitz,* 128 F.R.D. at 631 (emphasis in original).

7. Bally's contention that plaintiff Karinsky's claims are atypical because he purchased stock *after* the proposed class period is unavailing. *See Fry v. UAL Corp.,* 136 F.R.D. 626, 632 (N.D.Ill.1991).

may be presumed for purposes of a Rule 10b–5 action." *Basic,* 485 U.S. at 247, 108 S.Ct. at 991–92.

This unique information argument, as plaintiffs point out, is no different (and, if anything, less suspect) than the broker's advice cases which reject challenges to typicality on this basis. Reliance on a broker's advice, for example, "does not rebut the presumption that [plaintiff] relied on the price reported by the broker being an accurate reflection of the stock's value." *E.g., Schwartz,* 138 F.R.D. at 108 (typicality present); *see also In re Western Union Sec. Litig.,* 120 F.R.D. 629, 634 (D.N.J. 1988) ("differing types of reliance are present in almost every securities class action, and if this were enough to defeat class action certification on typicality grounds there could never be a class action of securities purchasers"). Thus, reliance here by Starr, Mirizzi, and Karinsky on personal knowledge of the casino industry does not defeat certification on typicality grounds.

■ Bally's third unique defenses argument is that class members like Mirizzi, who sold Bally stock during the class period, are atypical to those who did not; the defense Bally proposes is apparently that Mirizzi and others like him "gained a windfall profit at the expense of investors who purchased." Response to Class Certification Motion at 21. The case cited by the company in support of this proposition, however, makes clear that a proposed class representative is atypical if she "actually sold *more* ... shares than [s]he bought during the plaintiffs' proposed class period." *Katz v. Comdisco, Inc.,* 117 F.R.D. 403, 407 (N.D.Ill.1987) (emphasis added). Indeed, the proposed *Katz* class representative profited by more than $60,000 during the class period; given that circumstance, the court correctly found him atypical to other class members. *Id.* at 407–08.

Here, there is no argument by Bally that Mirizzi made as much as $60,000 during the class period—no argument, in fact, that Mirizzi made any money by selling Bally stock during the class period. The sale of stock during the class period, absent a showing of profit akin to that realized by the *Katz* plaintiff, is really a damage issue, and does not in and of itself disqualify the proposed class representative. *In re A.M. Int'l, Inc. Sec. Litig.,* 108 F.R.D. 190, 196 (S.D.N.Y.1985). As plaintiffs note, those investors who sell stock before the close of the class period are suitable class members (and representatives) because they have still suffered injury—"they may simply have been less injured." *Nelsen v. Craig-Hallum, Inc.,* 659 F.Supp. 480, 489 (D.Minn.1987).

The remainder of Bally's arguments opposing class certification need not detain us too long. Plaintiffs are correct when they argue that trimming the class period to Bally's specifications would be an impermissible assessment of the merits of the action. *See In re IGI Sec. Litig.,* 122 F.R.D. 451, 462 (D.N.J.1988) ("To limit the [class] period as [defendants] suggest would be tantamount to finding that[, among other things,] the five statements which together form the basis of the complaint were not part of a unified scheme to manipulate the stock; ... the court neither can nor should reach [such a conclusion] at this stage of the litigation, upon a motion for class certification.").

As to the question whether this court should certify plaintiffs' common law claims for class treatment, we agree with recent opinions in this district that reject arguments against certification because of supposed commonality or typicality problems. *See In re VMS Sec. Litig.,* 136 F.R.D. at 480 ("Plaintiffs will have to prove the same misrepresentations and omissions regardless of the state law applicable to each plaintiff's claims. Furthermore, substantial evidence concerning the federal securities claims will also apply to the state law claims, making common issues of fact pervasive."). Finally, because Bally is headquartered in Chicago, and all of the alleged misrepresentations and omissions occurred here, it would appear that Illinois law would apply to this case. Because "other cases involving allegations of misrepresentation in transactions concerning securities bought and sold on a national

exchange have been certified both as to federal securities and Illinois fraud claims," *Fry*, 136 F.R.D. at 631, we do not believe that plaintiffs' non-federal claims require us to decline to certify the proposed class.

Having considered all of the arguments, plaintiffs' motion for class certification is granted. Our analysis under Rule 23(a) and Rule 23(b)(3) reveals that the class is so numerous as to make joinder impracticable, that there are common issues of law and fact that predominate over individual issues, that typicality is present, and that the class will be adequately represented.

### III. Bally's Motion to Dismiss

■ Bally rests the bulk of its motion to dismiss on two recent Seventh Circuit opinions, *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.), *cert. denied,* — U.S. ——, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990), and *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 518 (7th Cir.1989). Those cases and *In re First Chicago Corp. Securities Litigation*, 769 F.Supp. 1444 (N.D.Ill.1991), are determinative here, and we dismiss the amended class action complaint.

The central theme of Bally's motion is that dismissal is warranted where "plaintiffs have not alleged any facts supporting their conclusory charge of fraud other than the facts that were disclosed in the very documents that plaintiffs now contend were fraudulent." Reply at 1. *Wielgos* and *DiLeo* both require the presentation of specific facts to support a fraud claim— facts showing more than the "[i]nevitable inaccuracy of [the] projection[s]" made by Bally, *Wielgos*, 892 F.2d at 514, facts that demonstrate "that the difference [between the firm's initially optimistic portrayal of itself and later business declines] is attributable to fraud." *DiLeo*, 901 F.2d at 627. This plaintiffs have not done.

With respect to *Wielgos*, it would appear that plaintiffs have alleged no facts sufficient to defeat the codified "safe harbor" for predictive, forward-looking statements. Exchange Act Rule 3b–6, 17 C.F.R. § 240.-3b–6, provides in pertinent part that

(a) A statement within the coverage of paragraph (b) of this section which is made by or on behalf of an issuer ... shall be deemed not to be a fraudulent statement (as defined in paragraph (d) of this section), unless it is shown that such statement was made or reaffirmed without a reasonable basis or was disclosed other than in good faith.

(b) This rule applies to the following statements:

(1) A forward-looking statement (as defined in paragraph (c) of this section) made in a document filed with the Commission ..., a statement reaffirming such forward-looking statement subsequent to the date the document was filed ..., or a forward-looking statement made prior to the date the document was filed ... if such statement is reaffirmed in a filed document....

(c) For the purpose of this rule the term "forward-looking statement" shall mean ...

(1) A statement containing a projection of revenues, income (loss), earnings (loss) per share, capital expenditures, dividends, capital structure or other financial items;

(2) A statement of management's plans and objectives for future operations;

(3) A statement of future economic performance ... or

(4) Disclosed statements of the assumptions underlying or relating to any of the statements described in paragraphs (c)(1), (2), or (3) above.

(d) For the purpose of this rule the term "fraudulent statement" shall mean a statement which is an untrue statement of a material fact, a statement false or misleading with respect to any material fact, an omission to state a material fact necessary to make a statement not misleading, or which constitutes the employment of a manipulative, deceptive, or fraudulent, device, contrivance, scheme, transaction, act, practice, course of business, or an artifice to defraud, as those terms are used in the Securities Ex-

change Act of 1934 or the rules or regulations promulgated thereunder.

It is essentially identical to the safe harbor in Rule 175 at issue in *Wielgos.*

Plaintiffs' protestations to the contrary, *Wielgos* is for all intents and purposes identical to this case. In *Wielgos,* the Seventh Circuit affirmed summary judgment for Commonwealth Edison where the class action plaintiffs alleged that the utility had drastically underestimated the costs of finishing a new nuclear power plant, and had failed to disclose the possibility that a branch of the Nuclear Regulatory Commission could deny the new plant an operating permit. *Wielgos,* 892 F.2d at 512.

The *Wielgos* court emphasized that "statements about the future are less reliable than statements about the past." *Id.* at 514. Commonwealth Edison's projections were protected by the safe harbor of Rule 175, even though they turned out to be inaccurate. *Id.*

> Inevitable inaccuracy of a projection does not eliminate the safe harbor, however. Rule 175 does not say that projections qualify only if firms give ranges and identify the variables that will lead to departure....
>
> ....
>
> ... If all estimates are made carefully and honestly, half will turn out too favorable to the firm and the other half too pessimistic. In either case the difference may disappoint investors, who can say later that they bought for too much (if the projection was too optimistic) or sold for too little (if the projection turns out to be too pessimistic). Thus the role of a safe harbor: the firm is not liable despite error.

*Id.*

Of course, issuers like Bally "need not reveal all projections," not even those that might contradict other projections. *Id.* at 516. A company "may reveal the projection it thinks best while withholding others, so long as the one revealed has a 'reasonable basis'—a question on which other estimates may reflect without automatically depriving the published one of foundation." *Id.*

We agree with Bally that *Wielgos* recognizes a safe harbor for predictive statements, "and that investors cannot defeat that shelter without strong facts showing that there was no reasonable basis for the company's predictions." Memorandum at 7. On the other hand, we recognize the difference between this case and *Wielgos* in terms of posture; as plaintiffs note, Bally's motion is one for dismissal (not summary judgment, as in *Wielgos),* and "[d]efendants' argument that Bally's representations had a reasonable basis raises factual issues that cannot be determined on this motion." Response at 9.

*DiLeo* and *In re First Chicago,* both dismissal and not summary judgment cases, clarify the fact and law intersection that concerns plaintiffs. In *DiLeo,* the Seventh Circuit made clear that "[i]nvestors seeking relief under Rule 10b–5 have to distinguish their situation from that of many others who are adversely affected by business reverses." *DiLeo,* 901 F.2d at 627 (citing, *inter alia, Wielgos* ).

The *DiLeo* complaint lacked a "single concrete detail," but told a familiar securities litigation story:

> At one time the firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud. "Must be" is the critical phrase, for the complaint offers no information other than the differences between the two statements of the firm's condition. Because only a fraction of financial deteriorations reflects fraud, plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud.

*Id.* (citations omitted). There is, the court said, "no 'fraud by hindsight' "—Federal Rule of Civil Procedure 9(b) requires dismissal of a complaint which fails to disclose "the circumstances that might separate fraud from the benefit of hindsight." *Id.* at 628. The complaint, alleging that stock prices had been artificially inflated because the bank's accounting firm had failed to disclose inadequate loan reserves, was cor-

rectly dismissed for lack of particularity. *Id.* at 630.

*In re First Chicago* applied the teaching of *DiLeo* to a situation where plaintiffs alleged that stock prices had been artificially inflated by overly optimistic press releases and SEC reports regarding the corporation's finances. Dismissing the suit under Rule 9(b), the District Court held that plaintiffs had alleged no facts to show that defendants had committed fraud. *In re First Chicago*, 769 F.Supp. at 1455. "A plaintiff alleging securities fraud cannot simply quote verbatim from annual reports and press releases and assert that the statements are untrue; he must explain in his complaint '*what* is untrue about each of the challenged statements.'" *Id.* at 1453 (citations omitted) (emphasis in original). *In re First Chicago* emphasizes that

> if a plaintiff needed only to quote statements from a corporation's annual report and allege that those statements were misrepresentations, anyone with a copy of a corporation's reports who was willing to pay the court filing fee could sustain a complaint of securities fraud against any corporation with declining fortunes.

*Id.*

Plaintiffs contend that Rule 9(b)'s requirements have easily been met, but *DiLeo* "requires a more rigorous explanation of why the plaintiff believes that the defendant's statements are fraudulent...." *Id.* at 1453–54 & n. 4. It is not enough that certain statements are *ex post* revealed to be inaccurate; plaintiffs fail to allege facts that might show why Bally's statements were fraudulent, and this failure must lead to dismissal. *DiLeo*, 901 F.2d at 627 ("Because only a fraction of financial deteriorations reflects fraud, plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud.").

Granted, a long list of "facts" are alleged in paragraphs 39 and 49 of the amended class action complaint (and, indeed, in other paragraphs), some of which "provide quite specific information as to

time, place, content, and speaker," *In re First Chicago*, 769 F.2d at 1453, but it is clear that "such technical compliance does not satisfy rule 9(b)'s edict in the securities fraud context." *Id.* *DiLeo* requires that "the who, what, when, where, and how" must be alleged, *DiLeo*, 901 F.2d at 627; *In re First Chicago*, 769 F.2d at 1453, and plaintiffs here have not complied with that requirement.

### IV. Conclusion

We grant plaintiffs' motion for class certification, and also grant Bally's motion to dismiss Count I of the amended class action complaint. We dismiss Counts II and III for lack of supplemental jurisdiction. It is so ordered.