Roy FUGMAN, Marilyn Fugman, Lillian O. Fugman, and the Estate of George Oskavarek, Plaintiffs,

v.

APROGENEX, INC., Joel Bresser, J. Donald Payne, and Luis Canterero, Defendants.

No. 96 C 5817.

United States District Court, N.D. Illinois, Eastern Division.

March 17, 1997.

---

Patrick Francis Solon, Paul K. Vickrey, Niro, Scavone, Haller & Niro, Chicago, IL, for Plaintiffs.

Jeffrey David Hupert, Hupert, Richards & Wood, Chicago, IL, David D. Sterling, Jeffrey A. Potts, Baker & Botts, L.L.P., Houston, TX, for Defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge.

Plaintiffs Roy, Marilyn, and Lillian Fugman, and the Estate of George Oskvarek, have brought suit against the defendants, Aprogenex, Inc., Joel Bresser, Donald Payne, and Luis Canterero, for securities fraud.[1] Aprogenex now moves to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, the motion is granted in part and denied in part.

### I. Motion to Dismiss Standard

Dismissal under Rule 12(b)(6) is improper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). For purposes of this motion, we must take all of the well-pleaded factual allegations in the complaint as true, and construe them in the light most favorable to the plaintiff. *See Richmond v. Nationwide Cassel L.P.,* 52 F.3d 640, 644 (7th Cir.1995).[2]

### II. Background

Like many other contemporary securities fraud cases, this case involves a failed investment in speculative technology. The defendant, Aprogenex, is a Delaware corporation that sought to develop a diagnostic test system (the "GenSite system") to identify the presence and extent of certain prenatal genetic abnormalities and diseases. *See* Compl. ¶ 14. The GenSite system was designed to perform tests which would identify abnormal fetal cells in the mother's blood and permit early diagnosis of up to 95% of prenatal genetic abnormalities. *See id.* Aprogenex believed that its test could be performed at one-third the cost of existing procedures while minimizing the risks associated with them, such as spontaneous miscarriage or injury to the fetus. *See id.* ¶ 15. Given that the GenSite system would be cheaper, more reliable, and safer than the available alternatives, the company expected high profit margins and a large sales volume when the system reached the market. *See id.*

Aprogenex's written public disclosures expressed considerable confidence in its ability to deliver a marketable product in the near future. During 1994, the company indicated

---

1. Because the other named defendants are being sued in their capacities as Aprogenex employees, we will refer to Aprogenex as "the defendant" for the sake of simplicity.

2. In accordance with this principle, the *Background* section which follows assumes the factual accuracy of the allegations in the complaint for purposes of this motion only: we will dispense with qualifying terms such as "allegedly," but the statements herein should not be understood as representing factual findings by this court. Also, after the receiving Aprogenex's motion to dismiss, the plaintiffs responded by filing an Amended Complaint. Our citations, therefore, are to the Amended Complaint.

that it expected to begin sales in Europe in the third quarter of 1995, and revealed that it had contracted with a European company to handle product distribution there. *See id.* ¶ 17. In its SEC filings in early 1995, Aprogenex stated that in addition to product development, a principal focus of its efforts in the coming year would be obtaining regulatory approval for the GenSite system in the United States, *see id.* ¶ 19, and in its amended filing in late October 1995 the company continued to express optimism that its system would soon be marketable, *see id.* ¶ 21. Aprogenex's publications, however, repeatedly emphasized that the company's success was contingent on the success of its research and development efforts. *See id.* ¶¶ 18, 20.

The oral statements of Aprogenex officials regarding the company's prospects were even more effusively optimistic than those contained in the written disclosures. These officials repeatedly assured the plaintiffs, through their broker, Joseph Baba, that the GenSite system would be commercially viable. *See id.* ¶¶ 24–27. The Complaint contains a lengthy catalogue of these assurances, which included such items as: (1) a prediction that the European revenues from the GenSite kit would be $30–40 million in its first year of sales, at a profit margin of 60%; (2) a disclosure that financier Carl Icahn had expressed an interest in purchasing up to 20% of Aprogenex's stock; and (3) a claim that pre-clinical work on the GenSite system had been completed. *See id.* ¶ 27. Despite these assurances, Baba became concerned when a report issued by Hoak Securities in the summer of 1995 suggested that Aprogenex had not yet completed the essential "cell enrichment" component of the GenSite system. *See id.* In response to Baba's inquiries, Aprogenex officials stated that the problems with the cell enrichment component had been "fixed," and reiterated their earlier claims that the system would be introduced into the European market in short order. *See id.* ¶¶ 27, 33–34. They also suggested that Abbott Laboratories and other big players in the industry were interested in the company and might engage in a "bidding war" to acquire its stock. *See id.* ¶ 27. They dismissed the cautionary language in their public disclosures as inaccurate and indicated

that the language existed only because it was "required by the lawyers." *See id.* Baba requested copies of the scientific reports that would substantiate the company's claims that the cell enrichment component was viable, but Aprogenex refused to provide these documents due to "confidentiality concerns." *See id.*

Based on the information provided to him by Aprogenex during 1994 and 1995, Baba recommended that the plaintiffs purchase Aprogenex stock. *See id.* ¶ 23. The plaintiffs accepted this advice, and made a series of stock purchases between November 29, 1994, and October 26, 1995. *See id.* & Ex. A. During this period, Baba relayed the various statements made by Aprogenex officials to the plaintiffs, and they relied on this information in their decisions to purchase Aprogenex stock and thereafter to retain the stock they already owned. *See id.*

In early 1996, Aprogenex revealed that it had decided to abandon its efforts to develop the GenSite system and that it would focus on other "opportunities." *See id.* ¶¶ 29–30. It had never been able to develop the cell enrichment component of the GenSite system, and thus had never been close to marketing the system. *See id.* Its representations that the problems with the cell enrichment component had been "fixed" and that the product would be marketable in the near future had been false all along, and Aprogenex either knew or was reckless about their falsity. *See id.* ¶ 27. Many of the other statements Aprogenex officials had made to encourage the plaintiffs to purchase and retain stock in the company—Carl Icahn's interest, the impending "bidding war" among other biotech firms interested in acquiring Aprogenex, the completion of pre-clinical testing—were also intentional or reckless fabrications. *See id.* Given Aprogenex's status as a start-up company, these false claims had a material impact on the value of its stock: unlike an established enterprise, whose stock can be valued based on book value or earnings-per-share, the stock value of a start-up is almost entirely dependent on the market's perception of the probable success of the company's product development efforts. *See id.* ¶ 13. Because

the price of Aprogenex stock was artificially inflated due to the company's intentional or reckless misrepresentations and omissions regarding the GenSite system, the plaintiffs collectively lost over $175,000 on their investments in Aprogenex stock. *See id.* ¶ 23.

## III. Discussion

■ A plaintiff presenting a claim for securities fraud must allege that the defendant: "(1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and (6) that reliance proximately caused plaintiff's injuries." *See In re HealthCare Compare Corp. Sec. Litig.,* 75 F.3d 276, 280 (7th Cir. 1996); *see also* 15 U.S.C. § 77j(b); 17 C.F.R. § 240.10b–5. Aprogenex does not dispute that the amended version of the Complaint at least superficially alleges all of these elements, but it nevertheless contends that the Complaint is inadequate in two ways: (1) it does not plead the elements of the fraud claim "with particularity" as required by Rule 9(b) of the Federal Rules of Civil Procedure and various provisions of the federal securities laws; and (2) the presence of cautionary language in Aprogenex's written publications renders the fraudulent statements immaterial, and reliance upon them unreasonable. Aprogenex also argues that claims based on stock purchases that occurred prior to September 19, 1995 are time barred. We consider each of these arguments in turn.

### A. Adequacy of the Pleadings

The Federal Rules of Civil Procedure state that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R.Civ.P. 9(b). Aprogenex argues that the plaintiffs' Complaint is insufficiently particular in three different respects: (1) it fails to provide enough detail in its list of fraudulent statements; (2) it fails to provide sufficient detail with respect to scienter; and (3) it fails

to provide sufficient detail to remove Aprogenex's predictive statements from the codified "safe harbor" for such statements. *See* Def.'s Reply Br. at 2–5.

### 1. Rule 9(b) in general

■ Pursuant to Rule 9(b), a complaint alleging securities fraud is sufficient only if "the circumstances are pled 'in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story.'" *In re HealthCare,* 75 F.3d at 281 (quoting *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990)); *see also* 15 U.S.C. § 78u–4(b). This requirement has three main purposes: to protect defendants' reputations, to prevent fishing expeditions, and to provide adequate notice to defendants of the claims against them. *See Vicom, Inc. v. Harbridge Merchant Servs., Inc.,* 20 F.3d 771, 777 (7th Cir.1994).

■ The plaintiffs' Amended Complaint unquestionably meets the "who, what, when, where, and how" standard for fraud pleadings. The Complaint sets forth 60 specific fraudulent statements, in each instance identifying the speaker, the time of the statement, and the substance.[3] Each statement or omission is accompanied by a brief explanation of why the plaintiffs believe it to have been false or misleading, and an allegation that it was material. These explanations, when viewed as a whole, provide a very clear picture of the fraud scheme the plaintiffs are alleging: the defendants knew that the GenSite system was not close to being marketable, and in fact might never be marketable, but they nevertheless engaged in a campaign of deception to persuade investors that the system was marketable, or would be in the very near future. Aprogenex has adequate notice of the nature of the claims against it, and this court has adequate assurance that we are not authorizing an open-ended fishing expedition by permitting the case to proceed.

---

**3.** While the plaintiffs are to be commended for the quantity of information provided with respect to the allegedly fraudulent statements, the format in which these details are presented is unfortunate. All of the statements are provided in a single paragraph of the Complaint (¶ 27), which includes 18 pages of single-spaced text, and which does not provide any numbering or reference system for the 60 statements contained therein. In their future pleadings in this court, the plaintiffs should take care to adhere to the requirement that "[e]ach averment of a pleading shall be ... concise." Fed.R.Civ.P. 8(e)(1).

Consequently, the purposes of Rule 9(b) are satisfied.[4]

### 2. scienter

Under the recently enacted Private Securities Litigation and Reform Act of 1995 (PSLRA), the pleading requirements for scienter in securities fraud cases have been made even more rigorous than Rule 9(b)'s already heightened standard: plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (West Supp.1997). Thus, the plaintiffs' Complaint must provide facts sufficient to create a "strong inference" that Aprogenex made the specified statements either knowing their falsity or with recklessness regarding their falsity. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976) (scienter means an "intent to deceive, manipulate or defraud"); *Rankow v. First Chicago Corp.*, 870 F.2d 356, 366–67 (7th Cir.1989) (recklessness satisfies the scienter requirement).

Although the "strong inference" requirement is relatively new, we can find guidance on its application in a recent and well-reasoned opinion by Judge Moran. *See Rehm v. Eagle Fin. Corp.*, 954 F.Supp. 1246 (N.D.Ill. 1997). After careful consideration of the legislative history of the PSLRA, Judge Moran concluded that in adopting § 78u–4(b)(2), Congress intended to adopt a pleading standard similar to that employed by the Second Circuit in cases like *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir.1994). *See Rehm*, 954 F.Supp. at 1252–53; *see also Marksman Partners, L.P. v. Chantal*

Pharm. Corp., 927 F.Supp. 1297, 1309–10 (C.D.Cal.1996). Under this standard, a plaintiff may establish the requisite strong inference of scienter either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields*, 25 F.3d at 1128; *Rehm*, 954 F.Supp. at 1252–53; *Zeid v. Kimberley*, 930 F.Supp. 431, 438 (N.D.Cal. 1996).

In this case, we believe that the plaintiffs' Complaint alleges facts which "constitute strong circumstantial evidence of conscious misbehavior or recklessness" by Aprogenex.[5] Throughout the period in question—November 1994 through October 1995—Aprogenex represented that the Gen-Site system was (or would soon be) marketable, declining to disclose its inability to complete the essential "cell enrichment" component of the system. *See* Compl. ¶¶ 17–21, 24. When questioned specifically on the viability of this component following reports that it was not operable, Aprogenex, through Joel Bresser, continued to insist that the performance of this component was "adequate," that any problems had been "fixed," that it "was commercially viable," and that the system would be launched in July 1995. *See* Compl. ¶ 27. Yet even when Joseph Baba specifically requested evidence that might have confirmed its claim that the cell enrichment component was operable, Aprogenex refused to provide it. *See id.* In late 1995, Aprogenex claimed that its system was adequate to meet the standards of its prospective European distributor, and it was only delaying the launch date so that it could

---

**4.** Aprogenex draws our attention to two cases that dismissed complaints because the plaintiffs merely listed a number of statements and then generally alleged that they were fraudulent. *See* Def.'s Reply Br. at 2–3. These cases stand for the proposition that plaintiffs must provide some explanation of why the specified statements are fraudulent—bald assertions to that effect are insufficient. *See In re Bally Mfg. Sec. Corp. Litig.*, 141 F.R.D. 262, 273 (N.D.Ill.1992) (Aspen, J.) (complaint dismissed because the "plaintiffs fail[ed] to allege facts that might show why Bally's statements were fraudulent"), *aff'd*, 2 F.3d 1456 (7th Cir.1993); *In re First Chicago Corp. Sec. Litig.*, 769 F.Supp. 1444, 1453 (N.D.Ill.1991)

("Vague and conclusory allegations that the defendant's representations were not true, however, are insufficient for 9(b) purposes."). The instant Complaint is distinguishable from those that were dismissed in *Bally* and *First Chicago* because the plaintiffs allege facts which explain why they believe each statement was fraudulent.

**5.** Because we conclude that the plaintiffs satisfy part (b) of the Second Circuit's test, we need not consider whether they have satisfied the more intricate "motive and opportunity" requirement of part (a).

"tweak" the technology to get even better results. *See id.*

All of these facts must be viewed in relation to the fundamental fact underlying this case: at no time was Aprogenex capable of moving the GenSite system from the drawing board to the realm of marketable technology. *See* Compl. ¶¶ 29–30. The defendants were necessarily aware of this inability, even if they honestly believed it would soon be rectified. In combination with Aprogenex's refusal to release data to back up its optimistic forecasts, we think this awareness constitutes strong circumstantial evidence that Aprogenex knew all along that its representations that the GenSite system was "adequate" or "fixed," and that the launch date was imminent, were false. In *Rehm*, the court inferred scienter under similar circumstances. The court noted "the defendant's attempts to mollify public doubt about [their] financial health by putting an optimistic and reassuring 'spin' on otherwise damaging [reports] shows that the defendants acted with knowledge of [their] deteriorating earnings." *Rehm*, 954 F.Supp. at 1256. The court concluded that, in combination with other evidence, "defendants' careful statements mitigating the seriousness of the [problem] raises a strong inference that defendants acted with [scienter]." *Id.* Similarly, we conclude that Aprogenex's statements mitigating the seriousness of their failure to complete the cell enrichment component of the GenSite system create a strong inference of scienter, and thus the plaintiffs have satisfied § 78u–4(b)(2).

### 3. forward-looking statements

■ As in the case of scienter, Rule 9(b)'s particularity requirement is heightened even further with respect to forward-looking statements,[6] which are protected by a "safe har-bor" provision unless they are made in bad faith or without a reasonable basis. *See* 17 C.F.R. § 240.3b–6 (stating that a forward-looking statement "shall not be deemed to be a fraudulent statement ... unless it is shown that such statement was made or reaffirmed without a reasonable basis or was disclosed other than in good faith"); *In re Bally Mfg. Sec. Corp. Litig.*, 141 F.R.D. 262, 271 (N.D.Ill.1992) (Aspen, J.) (dismissing a securities fraud claim because of the safe harbor provision), *aff'd*, 2 F.3d 1456 (7th Cir.1993). Hence, when forward-looking statements are alleged to be fraudulent, the "plaintiffs must allege 'specific facts which illustrate that [the defendant's] predictions lacked a reasonable basis.'" *In re HealthCare*, 75 F.3d at 281 (quoting *Arazie v. Mullane*, 2 F.3d 1456, 1468 (7th Cir.1993)); *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 513 (7th Cir.1989.) Aprogenex contends that many of the allegedly fraudulent statements listed in the Complaint are subject to this safe harbor provision. *See* Def.'s Reply Br. at 4 & n. 2 (specifying predictive statements). We agree.

■ With respect to the forward-looking statements listed in the Complaint, the plaintiffs provide no facts that would support the view that Aprogenex lacked a reasonable basis when making them besides the simple reality that they ultimately proved to be wrong. To pick just two examples, in January 1995 Aprogenex predicted that when introduced in the European market, the GenSite system would attain $30–40 million in sales in its first year, *see* Compl. ¶ 27 (statement 7), and in April 1995 it predicted a July launch date, at which time the company would stage a number of promotional "hooplas," *see id.* (statement 12).[7] Obviously these optimistic predictions turned out to be false, but this alone does not permit us to

---

6. The definition of "forward-looking statement" is: "(1) A statement containing a projection of revenues, income (loss), earnings (loss) per share, capital expenditures, dividends, capital structure or other financial items; (2) A statement of management's plans and objectives for future operations; (3) A statement of future economic performance ... or (4) Disclosed statements of the assumptions underlying or relating to any of the statements ... above." 17 C.F.R. § 240.3b–6(c).

7. Aprogenex's use of the term "hooplas" to describe its anticipated promotional efforts is somewhat ironic in light of the fraud litigation in which it is now embroiled: in addition to the more common definition of the term as "jovial commotion or excitement," "hoopla" is also defined as "misleading or confusing talk." *See* Webster's New Riverside University Dictionary 591 (1984).

conclude that they lacked a reasonable basis when made. *See In re HealthCare*, 75 F.3d at 281 ("Projections which turn out to be inaccurate are not fraudulent simply because subsequent events reveal that a different projection would have been more reasonable."); *Wielgos*, 892 F.2d at 513 ("Forward-looking statements need not be correct, it is enough that they have a reasonable basis."). Aprogenex may have honestly believed that these predictions would come true: the plaintiffs have not shown that the European market for prenatal diagnostic testing systems was smaller than $30 million per year, or that a July launch date was impossible as of April 1995. The plaintiffs have failed to carry their burden of alleging facts indicating that Aprogenex lacked a reasonable basis for its predictions, and thus Aprogenex's motion to dismiss is granted with respect to those statements.[8]

### B. Cautionary Language

■ As discussed in the *Background* section *supra*, Aprogenex's written public disclosures contained a good deal of general cautionary language regarding the risks facing prospective investors. *See* Compl. ¶¶ 18, 20; Def.'s Motion Ex. 1 at 6–13 (Aprogenex's 1993 prospectus, containing a lengthy discussion of "risk factors" related to the company's stock). For instance, Aprogenex emphasized that "there can be no assurance that there will not be additional delays in the enrichment system ... or that the enrichment system will ever be successfully developed by the Company." *See* Compl. ¶ 20.

Aprogenex makes two separate arguments based on this kind of cautionary language. The first relies on the "bespeaks caution" doctrine, which provides that "when forecasts, opinions, or projections in a disclosure statement are accompanied by meaningful warnings and cautionary language," the forward-looking statements may be deemed immaterial as a matter of law. *See Harden v. Raffensperger, Hughes & Co.*, 65 F.3d 1392, 1404 (7th Cir.1995); *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371 (3d Cir. 1993). We need not address this argument since we have already dismissed the plaintiffs' claims insofar as they are based on forward-looking statements.[9] *See supra* Part III.A.3.

■ Aprogenex's second argument is that plaintiffs cannot claim to have reasonably relied on oral representations that are contradicted by the cautionary language in the company's written publications. Aprogenex directs our attention to the well-settled rule in securities fraud cases that "[d]ocuments that unambiguously cover a point control over remembered (or misremembered, or invented) oral statements." *Associates in Adolescent Psych. v. Home Life Ins. Co.*, 941 F.2d 561, 571 (7th Cir.1991); *see also Carr v. CIGNA Sec., Inc.*, 95 F.3d 544, 547 (7th Cir.1996); *Ambrosino v. Rodman & Renshaw, Inc.*, 972 F.2d 776, 786 (7th Cir.1992); *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 530 (7th Cir.1985). This principle is inapplicable to the facts of this case, however, because Aprogenex's

---

**8.** After an examination of the statements challenged by Aprogenex, we find that the following statements are subject to the safe harbor provision: 2–5, 7, 12–13, 16, 18, 20–25, 30–31, 33, 38, 43, 45, 47–50, 52, and 55–59. We disagree with several of Aprogenex's other suggestions however. Statement 9, where Joel Bresser claimed that "Carl Icahn had expressed an interest in Aprogenex," is not forward-looking, nor is the first part of Statement 19, containing the assertion that "pre-clinical work had been completed." Other non-forward-looking statements are Statement 35, where Aprogenex claimed that the use of another company's cell separation technology "would be acceptable to Zeneca," and Statement 39, containing Joel Bresser's suggestion that Joseph Baba ask for the scientific data that would prove that the GenSite system was viable. And as is implied by Aprogenex's decision to challenge only a select group of the

statements listed in the Complaint, many of the other statements are not forward-looking at all, but are simple statements of fact. These include representations such as those indicating that cell enrichment component was "commercially viable," that the problems with the GenSite system had been "fixed," and that the system was "ready for an immediate launch."

**9.** The bespeaks caution doctrine does not apply to fraud claims based on representations of "hard facts" rather than forward-looking statements. *See Harden*, 65 F.3d at 1406. Hence, the cautionary statements in Aprogenex's written public disclosures cannot render immaterial Aprogenex's factual representations that the cell enrichment component of the GenSite system was "adequate" or "fixed."

fraudulent oral representations were not contradicted by its written warnings. The warnings merely indicate that Aprogenex stock should be regarded as a risky investment because its research efforts might ultimately fail. This does nothing to contradict Aprogenex's subsequent assertions that the GenSite system had been "fixed" and was ready for market: the riskiness of Aprogenex's venture *ex ante* does not mean that its subsequent success was impossible or implausible. The *Carr* case, upon which Aprogenex primarily relies, supports this reasoning: to contradict a representation that an investment is risky, one must represent that the investment is safe. *See Carr*, 95 F.3d at 547. The investment's actual success or failure is a different issue. The plaintiffs might reasonably have relied on Aprogenex's representations that its efforts had been successful despite the substantial risks looming at the outset of the venture, and we therefore decline to dismiss the Complaint on this ground.

### C. Statute of Limitations

■ Securities fraud claims must be brought within one year after the discovery of the facts constituting the violation and within three years after the violation. *See* 15 U.S.C. 77m; *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364, 111 S.Ct. 2773, 2782–83, 115 L.Ed.2d 321 (1991). The one-year clock begins to run when the plaintiff is put on inquiry notice of the fraud, rather than when the plaintiff actually discovers it. *Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 609 (7th Cir.1995). Inquiry notice occurs " 'when the victim of the alleged fraud [becomes] aware of facts that would have led a reasonable person to investigate whether he might have a claim.' " *Id.* (quoting *Tregenza v. Great Am. Communications Co.*, 12 F.3d 717, 718 (7th Cir.1993)). In the context of a motion to dismiss, we must bear in mind that the statute of limitations is an affirmative defense, and a plaintiff is not required to negate an affirmative defense in his complaint. *See Tregenza*, 12 F.3d at 718; *cf. LaSalle v.*

*Medco Research, Inc.*, 54 F.3d 443, 447 (7th Cir.1995) (suggesting that statute of limitations questions are easier to resolve after discovery). But if the plaintiff pleads facts that show that his suit is time-barred, he can plead himself out of court. *Tregenza*, 12 F.3d at 718.

■ Aprogenex contends that claims based on stock purchases that occurred more than one year prior to the filing of this suit are barred because the plaintiffs had inquiry notice of the fraud as soon as the fraudulent statements were made.[10] See Def.'s Reply Br. at 8. Aprogenex's argument is very similar to its reasonable reliance challenge: it suggests that the "contradictory" cautionary language contained in its written publications would have caused a reasonable person to doubt the company's representations that the GenSite system was "fixed" and ready for market. *See id.* at 9–10. The problem with this reasoning, as we have already pointed out, is that there is really no contradiction between Aprogenex's initial warnings regarding the riskiness of the venture and its subsequent claim that the GenSite system was marketable. *See supra* Part III.B. The mere existence of the cautionary language would not compel a reasonable investor to suspect that Aprogenex's subsequent representations about the GenSite system were fraudulent.

When the critical misrepresentations were made—in August and September of 1995—there was no reason (or at least there is none apparent on the face of the complaint) why the plaintiffs' suspicions would necessarily have been aroused. The only evidence available to the plaintiffs that was in tension with Aprogenex's claims was the July report by Hoak Securities which suggested that the cell enrichment component of the GenSite system was not yet complete. When the plaintiffs, through Joseph Baba, asked Aprogenex officials whether the Hoak report was accurate, the officials specifically indicated that the problems had been fixed. A reasonable investor in the plaintiffs' position in August of 1995 might well have trusted the

---

**10.** Aprogenex contends that "claims accruing before September 19, 1995 are time-barred." We assume that Aprogenex means September 12, 1995, since the initial complaint in this case was filed on September 12, 1996.

representations of the scientists at Aprogenex rather than those made by the investment bankers who authored the Hoak report, whose information, even if initially accurate, might have grown stale since July. The only event we can see that would unquestionably provoke suspicion in a reasonable investor is Aprogenex's refusal in October 1995 to provide Baba with test results that would back up its claims that the GenSite system was marketable. But if inquiry notice did not occur until October—eleven months prior to the filing of this suit—then the statute of limitations has not been violated.[11] Accordingly, we decline to dismiss this case pursuant to the statute of limitations.

## IV. Conclusion

For the foregoing reasons, Aprogenex's motion to dismiss is granted with respect to the forward-looking statements in the Complaint, but denied in all other respects. It is so ordered.

11. We express no view at this stage as to when inquiry notice actually occurred: perhaps discovery will reveal that a reasonable investor would have become suspicious prior to October 1995. That is for Aprogenex to prove, however; we cannot infer it from the face of the complaint.